IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

---

No. 97-10773

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JAMES TRUESDALE; RONALD HAMILTON;
RICHARD E. JONES; SANDRA MILNER,

Defendants-Appellants.

---

Appeals from the United States District Court for the
Northern District of Texas

---

August 24, 1998

Before GARWOOD, JONES and WIENER, Circuit Judges.

GARWOOD, Circuit Judge:

Defendants-appellants James Truesdale (Truesdale), Ronald Hamilton (Hamilton), Richard E. Jones (Jones), and Sandra Milner (Milner) (collectively appellants) were convicted on multiple counts for their involvement in a gambling operation. Finding that there is insufficient evidence supporting the convictions, we reverse on all counts.

### Facts and Proceedings Below

This case arises from a sports wagering operation that

accepted bets in the Caribbean, but conducted some of the financial transactions related to those bets in the Dallas, Texas, area. The participants were indicted on various conspiracy, money laundering, travel in aid of racketeering, and gambling counts related to their involvement in this bookmaking operation. They were all convicted on multiple counts and sentenced to prison terms ranging from 15 to 46 months.

Jones was the head of an international sports wagering service, variously known as Spectrum or World Sportsbook (WSB), that operated in the Dominican Republic, Jamaica, and Dallas. WSB maintained offshore offices in order to provide a way for people in the United States to place bets on sporting events without running afoul of domestic gambling laws. In Jamaica and the Dominican Republic, a properly licensed company that complies with local laws can legally operate a bookmaking service, like WSB, as long as the service does not accept bets from local individuals. In Dallas, however, bookmaking is illegal under the laws of the State of Texas.

The offshore operation began in 1990 when Jones formed Spectrum SA in the Dominican Republic for the purpose of accepting international phone bets. Spectrum was formed with the assistance of a local attorney who filed the necessary paperwork and helped Spectrum obtain a license from the Dominican government that allowed it to accept wagers on sporting events via international phone calls. To facilitate this business, Spectrum had an office

2

in the Dominican Republic, with eight phones and desks, that was staffed during regular business hours with persons who would answer the phones and process the wagers.

Later, the operation was moved to Jamaica because Jamaica had lower phone rates. In Jamaica, a new corporation was formed with the assistance of a local attorney who filed the required paperwork, making the operation legal under Jamaican law. WSB's office in Jamaica, like its office in the Dominican Republic, was set up with desks and multiple telephones for the purpose of receiving bets from offshore. The Jamaican office was staffed by persons from the Dominican Republic, Jamaica, and the United States.

Bettors in the United States could place bets at these foreign offices through toll-free numbers that WSB had set up. There were several toll-free numbers associated with the wagering service. Some of these numbers terminated at locations in the Dallas area, while others terminated in the offshore office of WSB.

The numbers that terminated in the Dallas area were "information only" lines and were not used to accept bets. Two of these information-only lines terminated at Jones's and Truesdale's homes. A potential bettor would first have to call one of these information lines. Thereafter a member of the operation would send an information packet to the bettor explaining the operation. The information packages gave general information about WSB, payoff information, information on how to set up a wagering account, etc.

These information packages listed, among other things, two information-only numbers for contacting WSB.

Before a bettor could place bets, he would first have to send money to open a betting account with WSB. To open an account or to replenish an existing account, bettors would wire money via Western Union or send it with Federal Express. Two gamblers testified at trial that they made their checks payable to S.K. Milner. The government also presented evidence that Truesdale and Hamilton would go to the Western Union office to pick up the money transfers and deposit the money in various bank accounts belonging to Truesdale, Jones, or Milner, in the Dallas-Fort Worth area.

Not all bettors were required to pay up front. Those that did not maintain betting accounts with WSB would mail large amounts of cash to Jones, listing Milner as the return addressee. Milner was listed as the return addressee so that if the packages got lost in the mail they would still reach a member of the operation. Postal inspectors seized several of these packages; Jones admitted that two of the packages were gambling proceeds and a third was money connected to gambling.

Once a betting account had been opened with WSB, a bettor could call the information lines to get balance information about his account. However, he could only place a bet by calling one of the betting lines in the Dominican Republic or Jamaica. The payoffs to winners were made from accounts in the Dallas-Fort Worth area belonging to Truesdale and Hamilton.

4

In addition to their involvement with WSB's financial transactions and information lines, Hamilton and Truesdale both maintained their own sports information telephone lines through which they promoted WSB by advertising the wagering service and giving out information-only toll-free numbers to call. In exchange for this advertisement, they were given fifty percent of the profits that WSB derived from bettors that they brought in.

Milner was even more involved in the organization. In addition to mailing out information packages, Milner also received money from bettors. Milner also had access to Jones's bank account and post office box, which were used for WSB-related business. And she handled many of the accounting matters related to the bettors' accounts.

Jones, as the head of WSB, traveled frequently to Jamaica to oversee the operation. He could also monitor the operation from his home in Dallas where he had access to the betting information. From his home in Texas he could access the Jamaican computer to view betting information. The computer in Jones's home was equipped with a modem that not only allowed him to view information, but also allowed Jones to input information directly into the Jamaican computer.

On December 8, 1992, Jamaican police, with the cooperation of United States law enforcement personnel, searched WSB's Jamaican office. After the search in Jamaica, the operation was moved back to the Dominican Republic and continued there.

On June 18, 1993, law enforcement officials moved to shut down the WSB organization in Dallas. The search of Jones's home revealed that Jones maintained an office in his home that contained a computer, office-size photocopier, shredding machine, two desks, multi-line telephone, a fax machine, and a bank of televisions. A safe was found in the floor of the master bedroom. Agents seized documents, including a tally sheet indicating that more than $2 million were wagered from April 15, 1993, to June 15, 1993. They also found some black ashes floating in the toilet. While the agents were searching the home, the phone rang several times with callers asking for "line information" and checking their deposits. Three of the callers also asked to place bets.

When agents searched Hamilton's home they found a tally sheet of bets placed with the operation similar to the sheet from Jones' home. The agents also received a call from a person wanting to know the line on a sporting event, and when asked whether he wanted to place a bet, he replied "Yes." The agents also seized a list of bettors.

At Truesdale's and Milner's residences the agents seized numerous WSB documents, cashiers checks, and Western Union transfer receipts and money order receipts totaling $473,114.

The appellants were indicted for conspiring to commit various violations in connection with their gambling operation. Additionally, they were each charged with various substantive offenses including operating an illegal gambling business,

6

traveling in aid of racketeering, and money laundering.

The jury found Truesdale, Hamilton, and Milner not guilty of conspiracy, but guilty on several counts of money laundering and guilty of illegal gambling. Jones was convicted of conspiracy, illegal gambling, and money laundering, but found not guilty on most of the "traveling in aid of racketeering" counts.

At sentencing, the court granted a downward departure for all appellants. Truesdale and Hamilton's base offense levels were reduced from 20 to 12, and Milner and Jones's levels were reduced from 23 to 16.

Truesdale was sentenced to 15 months in jail and 3 years' supervised release, fined $10,000, and ordered to pay a special assessment of $250.

Hamilton was also sentenced to 15 months in jail with 3 years' supervised release, fined $7500, and ordered to pay a special assessment of $100.

Jones was sentenced to 46 months in jail with 3 months' supervised release, fined $12,500, and ordered to pay a special assessment of $350.

Milner was sentenced to 24 months in jail and 3 years' supervised release and no fine and ordered to pay a $200 special assessment.

### Discussion

Appellants, who made appropriate Fed. R. Crim. P. 29 motions

7

below, argue that there was insufficient evidence supporting their convictions on Count Two for illegal gambling.  We agree and reverse their convictions on Count Two.  Additionally, because we agree that the appellants did not engage in illegal gambling as alleged in the indictment and charged to the jury, we also reverse the conspiracy, money laundering, and travel in aid of racketeering convictions, since those convictions all depended on a finding that the appellants engaged in illegal gambling activity.

The standard of review for sufficiency of the evidence is high, and we must affirm if a rational trier of fact could have found that the evidence, viewed in the light most favorable to the government, established guilt beyond a reasonable doubt.  *See Glasser v. United States*, 315 U.S. 60, 80 (1942); *United States v. Gardea Carrasco*, 830 F.2d 41, 43 (5th Cir. 1987).

Count Two of the indictment charged Jones, Truesdale, Hamilton, and Milner with conducting an illegal gambling operation in violation of 18 U.S.C. § 1955, which prohibits conducting, financing, managing, supervising, directing, or owning, "all or part of an illegal gambling business."  *See* 18 U.S.C. § 1955(a). Under section 1955, an illegal gambling business is defined as a gambling business that: (1) violates state or local law, (2) involves 5 or more people, and (3) is in continuous operation for more than 30 days or has gross revenue of $2,000 in a single day. *See* 18 U.S.C. § 1955(b)(1); *United States v. Heacock*, 31 F.3d 249,

8

252 (5th Cir. 1994).[1]

In order to meet the first prong (violation of state law), the indictment alleged that appellants' gambling operation was being conducted in violation of Chapter 47, *Gambling*, of the Texas Penal Code. The indictment did not cite a specific provision within this chapter, but it alleged *only* "bookmaking."[2] Additionally, the government's case focused entirely on and the jury charge instructed *only* on the "bookmaking" provisions of Chapter 47. Chapter 47 defines "bookmaking" as follows:

> "(A) to receive and record or to forward more than five bets or offers to bet in a period of 24 hours;
> (B) to receive and record or to forward bets or offers to bet totaling more than $1,000 in a period of 24 hours; or

---

[1]   Section 1955 reads as follows:

> "(a) Whoever conducts, finances, manages, supervises, directs, or owns all or part of an illegal gambling business shall be fined under this title or imprisoned not more than five years, or both.
>  (b) As used in this section—
>      (1) 'illegal gambling business' means a gambling business which—
>          (i) is a violation of the law of a State or political subdivision in which it is conducted;
>          (ii) involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business;  and
>          (iii) has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $2,000 in any single day."

[2]   The indictment alleged that "[appellants'] illegal gambling business involv[ed] bookmaking, in violation of the laws of the State of Texas (Title 10, Texas Penal Code, Chapter 47) . . . ."

9

(C) a scheme by three or more persons to receive, record, or forward a bet or an offer to bet." Tex. Penal Code § 47.01(2)(A)-(C).

Under Texas law "bookmaking" is illegal, and if a person intentionally or knowingly commits "bookmaking," he commits the offense of gambling promotion. Tex. Penal Code § 47.03(a)(2). Bookmaking, however, is not the only activity that constitutes gambling promotion. Section 47.03(a) lists five separate categories of activity (including "bookmaking") each of which can constitute gambling promotion.[3] Section 47.03(a) makes it a separate offense for an individual, for gain, to ". . . become[] a custodian of anything of value bet or offered to be bet[.]" Tex. Penal Code § 47.03(a)(3). In this case, neither the indictment nor the jury charge nor the government's argument alluded to this

---

[3] Section 47.03, Gambling Promotion, reads as follows:

"(a) A person commits an offense if he intentionally or knowingly does any of the following acts:
(1) operates or participates in the earnings of a gambling place;
(2) *engages in bookmaking*;
(3) for gain, becomes a custodian of anything of value bet or offered to be bet;
(4) sells chances on the partial or final result of or on the margin of victory in any game or contest or on the performance of any participant in any game or contest or on the result of any political nomination, appointment, or election or on the degree of success of any nominee, appointee, or candidate; *or*
(5) for gain, sets up or promotes any lottery or sells or offers to sell or knowingly possesses for transfer, or transfers any card, stub, ticket, check, or other device designed to serve as evidence of participation in any lottery." Tex. Penal Code § 47.03(a) (emphasis added).

section. The indictment only mentioned bookmaking and the jury charge only tracked the language of sections 47.01(2) and 47.03(a)(2). Thus, the illegal gambling convictions can only be sustained on the basis of a violation of the Texas law against "bookmaking," and the fact that the appellants engaged in financial transactions in the State of Texas that may have run afoul of section 47.03(a)(3) is irrelevant. So far as concerns the violation of the state—here Texas—law element of section 1955, this case was charged, tried, and instructed on solely on the basis of a claimed violation of the Texas prohibition against "bookmaking" as contained in sections 47.01(2) and 47.03(a)(2).

Appellants claim that there was insufficient evidence that they engaged in illegal bookmaking in Texas, because the bookmaking portion of their business occurred in Jamaica and the Dominican Republic. They argue that no bets were received, recorded, or forwarded in Texas. The government, however, argues that the jury could have *inferred* that the operation received, recorded, or forwarded bets, and thereby conducted illegal bookmaking, in Texas, and, in the alternative, the government argues that the operation conducted financial transactions related to the gambling operation with bettors in Texas, and, thus, a part of the betting operation's business was transacted in Texas, in violation of Texas law. We find the government's arguments unpersuasive.

As stated in the foregoing summary of the evidence, it is

11

plain that the bookmaking activities occurred outside the United States in Jamaica and the Dominican Republic. Under section 1955, the illegal gambling activity must violate the law of the state in which it is conducted. The evidence at trial indicated that the bets were taken in the Dominican Republic or Jamaica (where such activity is legal), and the government produced no evidence that anyone in the organization accepted bets in Texas, or otherwise violated the Texas bookmaking law. The government simply argues that the jury could have inferred that some bets were also being accepted in Texas, and thus appellants engaged in conduct that violated Texas law.

There is evidence that Jones took bets in the Dallas-Fort Worth area *before* he moved the operation offshore, and thereby violated Texas' bookmaking statute, but this evidence is irrelevant since these Texas bookmaking activities occurred before the time period stated in the indictment.

The fact that two of the toll-free numbers used by the organization terminated at the Texas residences of Truesdale and Jones is not probative of illegal bookmaking without some evidence that bets were actually accepted over these phone lines. If these were the only phone lines associated with WSB and the only means through which bettors could communicate with WSB, then perhaps a jury could rationally conclude that the lines were used for illegal

betting.[4] But there were other toll-free numbers, which were specifically designated as "betting lines," that terminated offshore and were in fact used to place bets. That is why there was a big operation offshore. It is not rational to infer beyond a reasonable doubt that simply because the phone numbers *could* have been used to receive bets in Texas, that they were actually used for this illegal purpose.

The only evidence that illegal betting was conducted over these information-only phone lines in Texas came from agents who answered the phones while searching the residences. When agents answered the phones at Jones's and Hamilton's residences, callers either asked for line information or checked whether their gambling account deposits had been received. Two agents testified that they took bets from these callers, but their testimony is not probative of any wrongdoing by the appellants.

A caller at Hamilton's house did not ask to place a bet, rather the agent searching the residence offered to take a bet from the caller. Agent Molina testified that when he answered the phone at Hamilton's house, he offered to take a bet from a caller, and the caller asked whether he had called the right number. Even after Molina answered "Yes," the caller refused to place a bet. Three callers at Jones's house placed bets on basketball or

---

[4] So also, perhaps, if these lines had no other purpose. But they clearly had other purposes—including to give information on the offshore betting and to establish credit.

13

baseball games.  But, the testimony does not suggest that any of these three callers had ever placed a bet over one of these lines before.  Indeed, one caller thought he was calling Jamaica.

The fact that agents allowed people to place bets on these phone lines is probative of very little.  At best it shows that callers may have attempted to place bets in Texas, but it does not indicate that appellants accepted bets from callers on these phone lines.

In addition to these phone calls, the government also points out that Jones had the *capability* to input information (such as bets and line information) into the betting computer in Jamaica from his home computer in Dallas.  But there is no evidence indicating that Jones (or anyone else) ever did this.  The government also argues that a notebook seized from Hamilton's residence containing account numbers, teams, and amounts *could* have been notes for accepting bets in Dallas.  Finally the government argues that black ash found  floating in Jones's toilet was evidence of something illegal.

Perhaps in some other circumstances, evidence of callers attempting to place bets, the mere capability to input illegal bookmaking information into the offshore computer, and the other circumstantial evidence might lead to a rational inference that appellants were engaged in illegal bookmaking in Texas.  However, looking at the overall circumstances of this case, such an

14

inference is unwarranted. Jones and his co-appellants went to great effort to make sure that their operation was legal. They set up offshore offices and consulted with lawyers in the United States and abroad on the legality of their enterprise; they furnished the Caribbean local offices with desks and telephones and staffed them with personnel to accept international phone wagers; they set up separate phone lines that could be used to place bets in the offshore offices. Under these circumstances, without specific evidence of any wrongdoing, it is irrational to conclude beyond a reasonable doubt that after having gone through the effort of fully equipping, staffing, and widely advertising the Caribbean offices, the appellants nevertheless illegally accepted bets in the United States.

The government has no direct evidence supporting its contention that appellants engaged in illegal bookmaking in Texas. And the circumstantial evidence here does not furnish an adequate basis from which a reasonable jury could conclude beyond a reasonable doubt that the appellants were engaged in bookmaking in Texas. The appellants went out of their way to stay within the law. The mere fact that they had the *capability* or even the opportunity to break the law by accepting bets in Texas is insufficient to prove that they actually did so.

In light of the weak circumstantial evidence, the government argues in the alternative that the convictions can be upheld

15

because appellants accepted money from bettors and paid out proceeds from bets in the United States. The government maintains that these financial transactions were an essential part of the operation. It may be true that these financial transactions were essential to the overall *operation*, but they do not establish an essential element of the crime of "bookmaking" as it is defined by Texas law. The Texas bookmaking statute prohibits recording, receiving, and forwarding *bets*; where and how the money is paid out is irrelevant under section 47.03(a)(2).[5] Becoming a custodian of money that is used to place bets offshore would be a violation of section 47.03(a)(3). However, the indictment did not allege that the appellants violated section 47.03(a)(3) and the jury was not instructed on any such violation. Nor was the case tried on that

---

[5] The jury seems to have been confused about whether accepting money for future betting constitutes "betting" under Texas law. During deliberations, the jury sent a note to the judge asking "[d]oes receiving money to facilitate the placing of a wager (to be done at a future time) constitute a bet?" The court did not answer this question, and responded "[t]he question you have posed is addressed in the court's charge and you should look to the charge, considering my instructions as a whole, for the answer." This response was inadequate, as the subject matter of the question was not directly or expressly addressed in the charge, and could not have cleared up the jurors' confusion. *See United States v. Stevens*, 38 F.3d 167 (5th Cir. 1994). The court should then have clearly instructed that Texas law has broken gambling down into two separate offenses: bookmaking (as defined in the instructions) and for gain becoming a custodian of anything of value bet or offered to be bet, or at the very least the court should have answered "No," as appellants requested below.

The court's instruction in response to the question was inadequate and would require reversal were we not in any event reversing the case because of insufficient evidence.

16

theory. In short, the government's case and the jury's verdict were focused exclusively on illegal *bookmaking*, and we cannot affirm the case on a different theory.

Because there is insufficient evidence to establish beyond a reasonable doubt that the appellants were guilty of operating a bookmaking service in violation of the Texas bookmaking statute, we reverse the convictions on Count Two. Additionally, because we are reversing the underlying gambling offense, we also reverse Jones's Conspiracy and Travel in Aid of Racketeering convictions, and we reverse all the appellants' money laundering convictions. All these convictions are predicated on the section 1955 violation charged in Count Two.

We reverse the money laundering convictions because without the gambling conviction there is no underlying criminal activity. Milner and Jones were convicted pursuant to 18 U.S.C. § 1956(a)(1)(A)(I) for: (1) conducting or attempting to conduct a financial transaction, (2) which the defendant then knew involved the proceeds of illegal activity, (3) with the intent to promote or further unlawful activity. *See United States v. Gaytan*, 74 F.3d 545, 555 (5th Cir. 1996). Truesdale and Hamilton were convicted pursuant to 18 U.S.C. § 1956(a)(1)(B)(I) for: (1) conducting or attempting to conduct a financial transaction, (2) which the defendant then knew involved the proceeds of illegal activity, (3) with the intent to conceal or disguise the nature, location,

17

source, ownership, or control of the proceeds of unlawful activity. *See United States v. Wilson*, 77 F.3d 105, 108 (5th Cir. 1996).

Money laundering requires that the defendant conduct or attempt to conduct a financial transaction involving the proceeds of an illegal activity. In this case, the only illegal activity that was ever alleged or submitted to the jury was illegal bookmaking. As discussed above, we reverse those convictions. Without those convictions, no illegal activity has been properly established upon which to base a money laundering conviction. We suspect that appellants' financial transactions in Texas probably ran afoul of section 47.03(a)(3), but the case was not tried on that theory, and without an indictment and appropriate jury instructions, we cannot uphold the money laundering convictions on such a basis.

We also reverse Jones's convictions for travel in aid of racketeering and conspiracy. Like money laundering, travel in aid of racketeering requires an underlying criminal activity. Jones was indicted for violating 18 U.S.C. § 1952(a)(3), which requires that the defendant travel in interstate or foreign commerce with the intent to "promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on of any unlawful activity[.]" 18 U.S.C. 1952(a)(3). The travel in aid of racketeering counts were explicitly made dependent on Count Two. The indictment specifically referred to the gambling enterprise

18

alleged in Count Two as the unlawful activity supporting the travel in aid of racketeering counts. Since we reverse the convictions on Count Two, there is no illegal activity on which to base a travel in aid of racketeering conviction, and hence we reverse these convictions. Finally, because we reverse all the substantive counts, we also reverse Jones's conviction for conspiracy to commit those offenses.[6]

## Conclusion

For the foregoing reasons, we reverse the appellants' convictions on all counts.

REVERSED

---

[6] Under the allegations of the indictment, the basis on which the government tried the case and the charge, the conspiracy ultimately depended on the theory that what was done—and there is no showing or claim that anything else was contemplated or agreed—constituted bookmaking in Texas contrary to sections 47.01(2) and 47.03(a)(2).