IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 98-10118

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

JOHN BRIAN POWERS,

Defendant-Appellant.

_____

Appeal from the United States District Court

for the Northern District of Texas

_____

February 25, 1999

Before EMILIO M. GARZA, BENAVIDES, and DENNIS Circuit Judges.

BENAVIDES, Circuit Judge:

John Brian Powers ("Powers") appeals from his October 14, 1997 conviction and January 22, 1998 sentence for mail fraud, wire fraud, and money laundering.  Powers contends that the evidence at his trial was insufficient to support his convictions; that the district court abused its discretion in admitting evidence of extrinsic transactions in addition to a

witness's prior consistent statements; that the district court erred in imposing a breach of position of trust enhancement as well as an obstruction of justice enhancement; and that the district court erred in imposing his sentence subject to the money laundering guidelines. For the reasons set forth below, we AFFIRM.

## I. BACKGROUND

On May 20, 1997, Powers was indicted by a grand jury in the Northern District of Texas. He was charged in Count 1 with a conspiracy to violate the mail and wire fraud laws, in violation of 18 U.S.C. § 371. Counts 2 through 7 charged him with executing his scheme by various mailings, in violation of 18 U.S.C. § 1341. Counts 8 through 15 charged him with executing the same scheme by use of the wires, i.e., telephone calls, in violation of 18 U.S.C. § 1343. Counts 16 through 20 charged him with money laundering to hide the proceeds of his fraud, in violation of 18 U.S.C. § 1956(a)(1)(B)(I).

Trial by jury commenced before United States District Judge Maloney on October 6, 1997. Powers moved for judgment of acquittal at the close of the Government's case and renewed this motion following the trial. On October 14, 1997, the jury returned verdicts of guilty on all counts submitted to it (counts 1 through 15 and 17 through 20; count 16 had been dismissed at the request of the attorney for the United States). Powers was sentenced on January 22, 1998, to 57 months imprisonment, a three-year term of supervised release, restitution of $27,437, and a mandatory special assessment of $950. Pending the outcome

of his appeal, Powers was released on bond.

Powers' criminal convictions stem from abuses of his position at Oryx Gas Marketing, a wholly-owned subsidiary of Oryx Energy Company ("Oryx"). Employed as a gas marketer, his job was to find markets and get the best value for Oryx's natural gas. In order to maximize profits, Oryx strongly discouraged its sales staff from selling to marketing companies, preferring to sell its gas directly to the end-user.[1]

One of Oryx's major customers was ISP, which bought natural gas for its plant at Texas City, Texas. ISP and Oryx had an ongoing gas sales contract in 1992 and 1993. George Matzke and Chuck Nuckolls were purchasing agents at ISP. Matzke was Nuckolls' supervisor. Powers handled ISP's account at Oryx.

In November, 1990, Powers and Matzke formed Long Valley Energy ("Long Valley"), using Powers' home address in Plano, Texas as the registered agent address.[2] The company never held any assets. In early 1992, Powers and Matzke discussed having Long Valley buy gas from Oryx which it would then resell to a third party, Cowboy Pipeline, at a profit. ISP, in turn, would buy from Cowboy Pipeline all the gas that Cowboy had purchased

---

[1] Oryx had a policy against conflicts of interest. Oryx managers and sales staff were asked to sign quarterly disclosure statements verifying that they understood the policy and had no such conflicts. Powers signed such a statement in February, 1991. Powers at no time revealed to his employer that he was operating under any such conflict.

[2] Powers disputes the "partnership" characterization of the Long Valley venture. According to him, Long Valley was Matzke's corporation, and Powers allowed him to use his home address only so that Matzke, who lived in New Jersey, would have the necessary Texas agent.

from Long Valley.[3]

Normally, a company like Long Valley -- without any credit history or assets -- would have difficulty buying gas from Oryx on credit. Oryx, however, never requested credit approval for Long Valley. Such a request for credit approval would have come from the salesperson making the deal which in this case was Powers.

Powers was also the Long Valley contact for Elise Wogan, the gas seller/buyer at Cowboy Pipeline. Wogan talked to Powers every month and provided him with the gas volume requirements for ISP for the coming month. Wogan asked Powers more than once if Cowboy could buy directly from Oryx. Powers did not respond to these inquiries.

Monthly sales between Oryx and Long Valley continued until January of 1993. During this time, Long Valley always paid a lower price to Oryx than Cowboy paid to Long Valley. The profits Long Valley earned by being inserted as a middleman were generally split equally between Matzke and Powers. Powers deposited the funds he received into the account of another corporation, ITEX, which he and his wife formed in 1992. Mrs. Powers would then write checks made payable to herself on the ITEX account and deposit these checks into the joint account she shared with her husband.

---

[3]In February 1992, ISP first bought gas from Cowboy Pipeline under this arrangement. ISP was not, however, satisfying all its Texas City plant gas needs through Cowboy; it simultaneously bought gas directly from Oryx. ISP always paid a higher price to Cowboy than it did to Oryx. ISP would have bought all its gas from Oryx, but for Matzke's instructions to Nuckolls, that 1000 units a day be purchased from Cowboy.

In addition to the sales to Cowboy Pipeline, Long Valley also sold gas to two other companies: American Central Gas Marketing ("American Central")[4] and Yuma Gas Corporation ("Yuma").[5]  Powers orchestrated the sales by Long Valley, and simply told Matzke to expect confirmation of them.  Matzke never talked to anyone at either American Central or Yuma.  Once again, the profits to Long Valley from these deals were split equally between Powers and Matzke.

## II.  SUFFICIENCY OF EVIDENCE

Powers challenges the sufficiency of the evidence to support his convictions for wire fraud, mail fraud, and money laundering.  The standard of review for sufficiency of the evidence is high.  See United States v. Truesdale, 152 F.3d 443, 446 (5th Cir. 1998).  In evaluating the sufficiency of the evidence on appeal, the reviewing court must consider the evidence in the light most favorable to the Government, drawing all reasonable inferences in support of the jury's verdict.  See id.  The evidence is sufficient if a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  See

---

[4]There were two sales from Long Valley to American Central, represented by invoices from May, 1992 and December, 1992.  The purchaser at American Central testified that his company and Oryx did business together, and that Powers was his contact at Oryx. He also believed that there was a connection between Powers and Long Valley.

[5]Yuma had an ongoing contract to buy gas from Oryx, but Powers called the company in June, 1992, and instructed Mark Keller, a Yuma vice president, to change the name of the seller from Oryx to Long Valley.  Powers said the name change had something to do with a joint venture.  Yuma paid Long Valley the same $1.61 per unit it would have paid to Oryx.  Long Valley, however, paid Oryx only $1.50 per unit.

United States v. Gaytan, 74 F.3d 545, 555 (5th Cir. 1996).  A

review of the sufficiency of the evidence, however, does not

include a review of the weight of the evidence or of the

credibility of the witnesses.  See United States v. Myers, 104

F.3d 76, 78-79 (5th Cir. 1997).

                    A.   Wire Fraud Counts

     Counts 8 through 15 of the indictment charged Powers with

executing a scheme to defraud by use of the wires, i.e.,

telephone calls, in violation of 18 U.S.C. § 1343, "[o]n or

about" June 16, 1992, July 23, 1992, August 21, 1992, September

8, 1992, October 21, 1992, November 17, 1992, December 15, 1992,

and January 6, 1993, respectively.  In order to establish wire

fraud, the Government must prove that a defendant knowingly

participated in a scheme to defraud, that interstate wire

communications were used to further the scheme, and that the

defendants intended that some harm result from the fraud.  See

United States v. St. Gelais, 952 F.2d 90, 95 (5th Cir. 1992).  An

intent to defraud for the purpose of personal gain satisfies the

"harm" requirement of the wire fraud statute.  See id.

     The evidence presented at trial establishes that Powers and

Matzke devised a scheme to defraud Oryx.  Their intent was to

insert Long Valley as a middleman between Oryx and ISP to obtain

for their own personal gain a portion of Oryx's monthly profits

on the sale of gas.  To implement the scheme, Powers, who lived

in Texas and Matzke who lived in New Jersey, of necessity

communicated by telephone.  The evidence showed that Matzke and

Powers spoke on the telephone several times a month, including on

the dates listed as individual counts in the indictment, and that "some of the calls involved the [Long Valley] transactions." The Government, however, failed to prove at trial that the telephone conversations which took place on the dates alleged in the indictment included discussion of the fraudulent scheme.

Powers argues that the Government's evidence was insufficient to prove wire fraud because it did not demonstrate that the specific telephone calls alleged in the indictment were made in furtherance of the fraud. Relying on <u>United States v. Galvan</u>, 693 F.2d 417 (5th Cir. 1982), Powers asserts that the Government must not only prove that the calls alleged in the indictment were made between Matzke and Powers, but also that, in those particular conversations, Powers and Matzke discussed the unlawful activity.

The Government correctly disputes Powers' legal conclusion. It is well established in this Circuit that the alleged time of the offense is not an essential element of the offense charged in the indictment. <u>See</u> <u>United States v. Bowman</u>, 783 F.2d 1192, 1197 (5th Cir. 1986) (finding nine month variance between the mailing date alleged in the indictment and the date to which witness testified at trial not fatal). The prosecution is "not required to prove the exact date [alleged in the indictment]; it suffices if a date reasonably near is established." <u>United States v. Grapp</u>, 653 F.2d 189, 195 (5th Cir. 1981); <u>see</u> <u>id.</u> (affirming conviction where evidence showed the mailing in "the middle of 1977" and indictment alleged mailing "on or about May 27, 1977"). Furthermore, Appellant's reliance on <u>United States v. Galvan</u>, 693

F.2d 417 (5th Cir. 1982), is misplaced. In <u>Galvan</u>, the Government attempted to prove a conspiracy by introducing phone records that indicated telephone calls between residences of the alleged conspirators. <u>See</u> <u>id.</u> We held that evidence showing mere telephone calls between alleged conspirators, absent proof of the subject matter of their conversations, was insufficient. <u>See</u> <u>id.</u> Unlike <u>Galvan</u>, the instant case is not one in which the jury had to infer that the conspirators actually talked about the scheme on the telephone. Matzke, himself, testified that he and Powers spoke on the telephone several times a month and that, at least once a month, the discussions concerned the Long Valley deals. Thus, we find the evidence sufficient to support Powers' convictions as to wire fraud.

## B.  Mail Fraud Counts

Counts 2 through 7 of the indictment charged Powers with executing a scheme to defraud by use of the mail, i.e., mailing of gas invoices from Oryx to Long Valley, in violation of 18 U.S.C. § 1341. In order to establish a violation of § 1341, the Government must prove:  (1) a scheme to defraud, (2) which involves the use of the mails, (3) for the purpose of executing the scheme. <u>See</u> <u>United States v. Gray</u>, 96 F.3d 769, 773 (5th Cir. 1996). We have explained that the mailing in a federal mail fraud prosecution "need not be sent by the defendant or his co-conspirator. It may be sent by a victim of the plot or an innocent third party, so long as the mailing is 'incident to an essential part of the scheme . . . or a step in the plot.'" <u>United States v. Manges</u>, 110 F.3d 1162, 1169 (5th Cir. 1997)

(quoting Schmuck v. United States, 489 U.S. 705, 710-711, 109 S.Ct. 1443, 1448 (1989)).

Powers claims that the evidence is insufficient to prove that the mailings of the invoices by Oryx were in furtherance of the scheme to defraud. He relies upon three Supreme Court cases and one Fifth Circuit case: Kann v. United States, 323 U.S. 88, 65 S.Ct. 148 (1944); Parr v. United States, 363 U.S. 370, 80 S.Ct. 1171 (1960); United States v. Maze, 414 U.S. 395, 94 S.Ct. 645 (1974); and United States v. Vonsteen, 872 F.2d 626 (5th Cir. 1989), superseded on other grounds, 950 F.2d 1086 (5th Cir. 1992) (en banc). In each of those cases, the mailings were found not to be in furtherance of fraudulent schemes because the mailings occurred after the fraud had been completed. In Powers' view, his and Matzke's alleged gas-profits scheme reached fruition at the point that Oryx and Long Valley had made sales agreements such that, "by the time the invoices were mailed, the price, quantity, and other terms were already decided." Thus, Powers concludes that the mailings "involved little more than post-fraud accounting." Vonsteen, 872 F.2d at 629.

This argument, however, ignores the purpose, goal, and motive of Powers' ongoing scheme to defraud Oryx--money. For this reason, we find that the cases cited by Appellant are inapposite. Powers' and Matzke's scheme was to sell gas to Long Valley month after month, and resell it at a profit to themselves, month after month. Here, the success of the alleged fraud depended upon Long Valley having the funds to pay Oryx for the gas Long Valley would purchase. Because Long Valley did not

hold any money or assets, Long Valley could not pay Oryx until Long Valley was first paid by Cowboy. The evidence at trial showed that Long Valley's receipt via the mails of the natural gas invoices from Oryx prompted Long Valley to send similar bills to Cowboy, triggering payment from Cowboy to Long Valley. We therefore find that the mailing of the invoices by Oryx satisfied the mailing requirement in the instant case. See Schmuck, 489 U.S. at 711-12, 109 S.Ct. at 1448 (holding that duped used-car retailers submitting title applications to state motor vehicles bureau satisfied mailing requirement where the success of the ongoing fraudulent venture "depended on Schmuck's continued harmonious relations with, and good reputation among, retail dealers, which in turn required the smooth flow of cars from dealers" to customers).

Thus, we hold that the evidence presented at trial is sufficient to support a finding that the mailings were in furtherance of the scheme.

### C. Money Laundering Counts

Counts 17 through 20 of the indictment charged Powers with laundering the proceeds of specified unlawful activity, i.e., mail and wire fraud, in violation of 18 U.S.C. § 1956(a)(1)(B)(i). Under the money laundering statute, the government must prove that the specific transactions in question were designed, at least in part, to launder money. See 18 U.S.C. § 1956(a)(1)(B)(i); United States v. Dobbs, 63 F.3d 391, 397 (5th Cir. 1995). Additionally, it must show that the defendant desired to create the appearance of legitimate wealth or

otherwise to conceal the nature of funds so that the money could enter the economy as legitimate funds.  See id. (citing United States v. Dimeck, 24 F.3d 1239, 1245 (10th Cir. 1994)).  The "purpose of the money laundering statute is to reach commercial transactions intended (at least in part) to disguise the relationship of the item purchased with the person providing the proceeds and that the proceeds used to make the purchase were obtained from illegal activities."  Id. (citing United States v. Sanders, 929 F.2d 1466, 1472 (10th Cir. 1981)).  Accordingly, a "scheme that conceals only the source of the funds falls within the purview" of 18 U.S.C. § 1956(a)(1)(B)(i).  United States v. Tencer, 107 F.3d 1120, 1129 (5th Cir. 1997) (citations omitted); see also United States v. Alford, 999 F.2d 818, 824 (5th Cir. 1993) (finding evidence sufficient to show a purpose to disguise fraudulent proceeds where the defendant and coconspirator agreed to split the proceeds, and defendant had proceeds mailed to a corporate account bearing his own surname).

Powers challenges the sufficiency of the Government's proof, specifically questioning the evidence of his intent to conceal the source of the laundered funds.  In doing so, he relies on United States v. Dobbs, 63 F.3d 391 (5th Cir. 1995), in which we reversed a money laundering conviction because the transactions at issue were "open and notorious--at least as much as typical bank transactions can be."  Id. at 397.  In Dobbs, a cattle rancher was charged with money laundering because he deposited some of the proceeds from the illegal sale of his cattle into his wife's bank account.  See id.  We determined that the deposit of

the cattle sale funds into the wife's account from which ordinary household and ranch expenses were paid did not support a money laundering conviction.  See id.

The Government correctly points out that the facts in the present case are not like those in Dobbs.  In Dobbs, the transactions were not disguised by the use of third parties.  See id.  Here, the deposit of checks made payable to ITEX from Long Valley were disguised by the use of a third party, namely ITEX.  The checks from Long Valley to ITEX did not reveal on their faces that Powers (or even his wife) was involved in the transactions.  Powers' connection to ITEX could be discovered only by accessing the bank records of ITEX, finding out that Mrs. Powers had an interest in the account, and then tracing the funds from the ITEX account to the couple's personal account.  Thus, Powers' use of ITEX evidences sufficient intent to conceal the source of the illegal funds.

Powers' money laundering convictions stand.

### III.  EVIDENTIARY CLAIMS

A district court's evidentiary rulings are reviewed for an abuse of discretion.  See United States v. Parks, 68 F.3d 860, 867 (5th Cir.1995).  If an abuse of discretion is found, the harmless error doctrine is applied.  See United States v. Skipper, 74 F.3d 608, 612 (5th Cir. 1996).  Consequently, we affirm evidentiary rulings unless the district court abused its discretion and a substantial right of the complaining party was affected.  See United States v. Asibor, 109 F.3d 1023, 1032 (5th Cir. 1997).

## A. Other Acts

Powers claims that evidence regarding (1) sales to Yuma and American Central and (2) transactions among F.W. Chemical, Long Valley, and ITEX should have been excluded pursuant to Rules 404(b) and 403. The Government responds that the first category of evidence was properly admitted because it was not extrinsic in that it went to prove the existence of the charged conspiracy. As to the second category, the Government asserts that the evidence was properly admitted under Rule 404(b) but that, in any event, the limiting instruction given to the jury cured any resultant prejudice to Powers.

The admission of extrinsic evidence is governed by Rule 404(b) of the Federal Rules of Evidence which states:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

Fed.R.Evid. 404(b). We admit evidence of extraneous acts under Rule 404(b) only if: (1) it is relevant to an issue other than the defendant's character, and (2) the evidence's probative value is not substantially outweighed by its undue prejudice. See United States v. Leahy, 82 F.3d 624, 636 (5th Cir. 1996); United States v. Beechum, 582 F.2d 898, 911 (5th Cir. 1978), cert. denied, 440 U.S. 920 (1979). That being said, evidence which is

intrinsic to the crime charged does not implicate Rule 404(b) and "consideration of its admissibility pursuant to Rule 404(b) [is] unnecessary." United States v. Garcia, 27 F.3d 1009, 1014 (5th Cir. 1994).

1.   American Central and Yuma Transactions

One of the main evidentiary disputes during the course of litigation was the characterization of the transactions involving American Central and Yuma as extrinsic or intrinsic acts. The Government contended that both sets of transactions were intrinsic acts which were inextricably intertwined with the conspiracy; Powers characterized the transactions as extrinsic evidence.

The district court does not appear to have resolved this evidentiary dispute. However, even if review of the record were to reveal that Judge Maloney, in fact, considered the American Central and Yuma evidence to be extrinsic, our precedent requires the contrary conclusion.

We consider evidence "'intrinsic' when the evidence of the other act and evidence of the crime charged are 'inextricably intertwined' or both acts are part of a 'single criminal episode' or the other acts were 'necessary preliminaries' to the crime charged." United States v. Williams, 900 F.2d 823, 825 (5th Cir. 1990). We have held that, where a conspiracy is charged, acts that are not alleged in the indictment may be admissible as part of the Government's proof. See, e.g., United States v. Coleman, 78 F.3d 154, 156 (5th Cir. 1996) (ruling that trial court properly admitted, as intrinsic evidence, defendant's

participation in non-plead carjacking-related acts); United States v. Quesada, 512 F.2d 1043, 1046 (5th Cir. 1975) (explaining that the Government, in proving a conspiracy, is not limited to overt acts alleged in the indictment and that the prosecution "may show other acts of the conspirators occurring during the life of the conspiracy"); United States v. Bullock, 451 F.2d 884, 889 (5th Cir. 1971) (finding no error where the trial court admitted evidence of five stolen money orders that were not mentioned specifically in the indictment for conspiracy to transport money orders).  Thus, because the non-plead American Central and Yuma transactions tend to show the conspiratorial relationship between Powers and Matzke, during the life of the conspiracy, we find that such "other acts" are intrinsic to the Government's proof and not subject to Rule 404(b).

Having determined that the American Central and Yuma transactions are intrinsic acts, we now consider Powers' alternative claim that admission of those transactions violated Federal Rule of Evidence 403.  The standard provided in Rule 403 is whether the probative value is "substantially outweighed" by the danger of unfair prejudice.  See Fed. R. Evid. 403.  We have explained that all probative evidence is by its very nature prejudicial.  See United States v. Bermea, 30 F.3d 1539, 1562 (5th Cir. 1994).  Evidence therefore should be excluded "sparingly" and only in those circumstances where the prejudicial effect substantially outweighs the probative value.  See United States v. Leahy, 82 F.3d 624, 637 (5th Cir. 1996).

We find that the district court properly admitted the

challenged evidence despite its prejudicial effect.  First, the American Central and Yuma evidence is highly probative.  The evidence showed that Powers used Long Valley the same way for these sales as he used Long Valley in sales to Cowboy, i.e., as a middleman to divert profit.  Additionally, the evidence went to prove the conspiratorial relationship between Powers and Matzke.  Second, the prejudicial effect is minimal.  We do not find compelling Powers' lone complaint that the Government used the American Central and Yuma transactions to mislead the jury and to bolster his allegedly illegal acts.

Accordingly, we find that the district court did not commit error in admitting the American Central and Yuma evidence.

## 2.  F.W. Chemical Transactions

The Government introduced evidence that Powers and Matzke shared profits from deals with another company F.W. Chemical.[6] The Government contended that this evidence was admissible under Rule 404(b) in relation to the charges of money laundering. Powers objected each time these transactions were discussed at trial.

Although not admissible as intrinsic to the acts charged in the indictment, the transactions involving F.W. Chemical are admissible under Rule 404(b) which allows extrinsic acts to be

---

[6]F.W. Chemical has bought waste chemicals from ISP since about 1989.  In 1992, F.W. Chemical paid $48,000 to ITEX on instructions from George Matzke in order to ensure that F.W. Chemical was able to continue to buy chemicals from ISP.  It appears that Matzke had some influence over who got to buy the chemicals.  Powers and Matzke had an agreement that Powers could keep half of the funds deposited by ITEX and send Long Valley a check for the remaining portion.

admitted if they show inter alia intent or knowledge.  Here, the
F.W. Chemical evidence was relevant to Powers' intent to launder
money.  No evidence was presented at trial tending to show that
F.W. Chemical and ITEX had any business relationship that would
warrant the payment of money from one company to the other.
Yet, money from F.W. Chemical was paid to ITEX (presumably so
that F.W. Chemical could continue to enjoy the right to buy waste
chemicals from Matzke's employer ISP), and from there, half of
the money was forwarded to Long Valley.  Because the Government
had charged Powers with laundering the profits of his Long Valley
deals through his ITEX account, the F.W. Chemical evidence is
probative of that intent.  See United States v. Dillman, 15 F.3d
384, 391 (5th Cir. 1994) (finding that a non-plead transaction
was intertwined with the overall criminal scheme, and that a
specific account was a main laundering vehicle for funds).

With regard to any undue prejudicial effect attaching to the
admission of the F.W. Chemical testimony, we find Power's
argument to be unpersuasive.  Whatever undue prejudice resulted
from the admission of the F.W. Chemical evidence, we find that
the court's "limiting instruction to the jury regarding the proof
of other criminal conduct" mitigated and cured it.  United States
v. Route, 104 F.3d 59, 63 (5th Cir.), cert. denied, ___ U.S. ___
, 117 S.Ct. 2491 (1997).

### B.  Prior Consistent Statements

Generally, a prior consistent statement is admissible, and
not considered to be hearsay, if it "is consistent with the
declarant's testimony and is offered to rebut an express or

implied charge against the declarant of recent fabrication or improper influence or motive." Fed. R. Evid. 801(d)(1)(B). Although Rule 801(d)(1)(B) does not mention a time limitation, the Supreme Court has stated that prior consistent statements are only admissible to rebut a charge of fabrication if the statements were made prior to the time that the declarant's motivation to fabricate arose. See Tome v. Unites States, 513 U.S. 150, 160, 115 S.Ct. 696, 705 (1995). Consequently, admitting statements under Rule 801(d)(1)(B) that were made after the time the motivation to fabricate arose constitutes error. See United States v. Riddle, 103 F.3d 423, 432 (5th Cir. 1997) (holding that the trial court erred in admitting a statement and letter provided to the Government by a witness who was attempting to trade information for a reduction in prison term).

Here, on cross-examination, Powers attempted to impugn Matzke's credibility by suggesting that Matzke had fabricated his story in exchange for a promise of a plea bargain and that Matzke's testimony before the jury was motivated by his desire to please the Government thereby fulfilling the requirements of his plea agreement. Matzke denied Powers' suggestion that his testimony was improperly motivated. In doing so, he commented that he previously had told to the FBI a story consistent with his direct trial testimony. The Government, on redirect and over objection, elicited testimony from Matzke confirming that he had indeed talked to the FBI during the course of their investigation and had told them a story consistent with his trial testimony.

Although we are dubious that Rule 801(d)(1)(B) would prohibit the Government, on redirect, to elicit testimony regarding the same prior consistent statement that was already presented to the jury on cross-examination by the same declarant, we need not make such a determination in resolving Powers' claim as any error here would be harmless.  See Riddle, 103 F.3d at 434 (noting that the trial court's error in admitting prior consistent statements is subject to a harmless-error analysis).  Matzke, on redirect, did not testify regarding the details of his conversations with the FBI but only made the summary representation that his direct testimony at trial was consistent with what he had told the FBI in 1996.  Because that same information had already been elicited on cross-examination by counsel for Powers, we find that no substantial right of Powers was adversely affected by the admission of Matzke's testimony regarding his prior meeting with the FBI.

IV. SENTENCING ISSUES

A.  Position of Trust Enhancement

Powers argues that the district court improperly enhanced his offense level two points for a breach of a position of trust, pursuant to U.S. Sentencing Guideline § 3B1.3.[7]  Powers asserts two alternative grounds for error.  First, Powers contends that

_____

[7]§ 3B1.3 provides in part:
> If the defendant abused a position of public
> or private trust, or used a special skill, in
> a manner that significantly facilitated the
> commission or concealment of the offense,
> increase by 2 levels. This adjustment may not
> be employed if an abuse of trust or skill is
> included in the base offense level or
> specific offense characteristic.

application of the § 3B1.3 enhancement amounted to double counting because his offense level was in part based upon depriving Oryx of his honest services--conduct which Powers attempts to equate with abusing a position of trust.[8]  Second, Powers claims that any breach of a position of trust by him did not significantly facilitate the commission of the offense.

When confronted with convictions on multiple counts, sentencing judges determine the offense level to be applied in accordance with U.S. Sentencing Guidelines §§ 3D1.1 , 3D1.2, 3D1.3, and 3D1.4.  See U.S. Sentencing Guidelines Manual § 3D1.1 (1997).  Powers was sentenced under the money laundering guidelines, § 2S1.1, because those guidelines produced the highest offense level when compared to the mail fraud or wire fraud guidelines, § 2F1.1.  See id. § 3D1.3(b).  Assumably, at the point that the court compared the applicable offense levels for the purposes of § 3D1.3, the money laundering guideline had not yet been enhanced for an abuse of a position of trust, § 3B1.3.  The reason is that the money laundering conduct for which Powers had been convicted did not, itself, include any abuse of trust (the transactions that served as the basis for the money laundering convictions were Powers' deposit of Long Valley checks into the ITEX account).

Once the sentencing court determined that the money laundering guidelines produced the highest offense level,

---

[8]The indictment alleged and the jury was charged that Powers could have committed fraud under either of two theories: (1) depriving Oryx of property, i.e., money, and (2) depriving Oryx of the right to honest services.

however, the court then considered "whether . . . adjustments from Chapter Three, Parts A, B, and C appl[ied] based upon the combined offense behavior taken as a whole." Id. § 3D1.3, Application n.3. In doing so, Judge Maloney properly applied the § 3B1.3 enhancement. Appellant's offense level was enhanced because the court believed that Powers' scheme to defraud Oryx was "significantly facilitated" by an abuse of a position of private trust. We note that the § 3B1.3 upward adjustment was applied to Powers' base offense level for money laundering and not to a base offense level for mail/wire fraud. Powers fails to appreciate this distinction. Thus, Appellant's argument that he was twice punished for an abuse of a position trust, i.e., through the application of the § 3B1.3 enhancement and an offense level that was in part based upon depriving Oryx of his honest services, lacks merit.

The question that remains is whether Judge Maloney's factual determination--that (1) Powers abused a position of trust and (2) such an abuse "significantly facilitated" Powers' scheme to defraud Oryx--constitutes clear error. See United States v. Brown, 7 F.3d 1155, 1161 (5th Cir. 1993) (explaining that the application of § 3B1.3 "involves a sophisticated factual determination," and is subject to review for clear error only).

Application Note 1 of § 3B1.3 provides in part: "For this enhancement to apply, the position of trust must have contributed in some significant way to facilitating the commission or concealment of the offense." We have explained that "to determine whether the position of trust 'significantly

facilitated' the commission of the offense, [a] court must decide whether the defendant occupied a superior position relative to all people in a position to commit the offense, as a result of [his] job." United States v. Fisher, 7 F.3d 69, 70-71 (5th Cir. 1993). In United States v. Scurlock, 52 F.3d 531 (5th Cir. 1995), we further noted that the appropriate comparison is between the defendant and the "public at large." Id. at 541.

Here, the proper inquiry is not whether Powers' occupied a position superior to his co-workers (as suggested by Appellant), but whether his position afforded him an opportunity not enjoyed by the general public. See Brown, 941 F.2d at 1305. Based upon the record, the sentencing court could have easily determined that Powers' opportunity to defraud Oryx was created by his position as gas marketer at Oryx. The evidence presented at trial indicated that Powers used his position to circumvent Oryx's policy to sell gas only to end-users with approved credit. Additionally, Powers used his position to approve some of his own deals with Long Valley. In light of these facts, we find that the district court's factual determination that Powers' breach of a position of trust significantly facilitated his scheme to defraud his employer, Oryx, does not constitute clear error. Therefore, the two level § 3B1.3 enhancement stands.

### B. Obstruction of Justice Enhancement

The Sentencing Guidelines authorize a two level increase in offense level for obstruction of justice "when a defendant engages in conduct which 'obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the

investigation, prosecution, or sentencing of the instant offense.'" United States v. Lowder, 148 F.3d 548, 552 (5th Cir. 1998) (quoting § 3C1.1). Powers argues that the obstruction of justice adjustment was improperly imposed because the government failed to prove by a preponderance of the evidence that Powers provided the Government and produced in court "false" exhibits. See United States v. Lombardi, 138 F.3d 559, 562 (5th Cir.1998) ("This Circuit has firmly established that the burden of proof at sentencing is usually by a 'preponderance of the evidence.'"). In particular, Powers asserts without citation to relevant authority that (1) Matzke was an incredible witness upon which the district court could not reasonably have relied and (2) the Government's proof lacked the benefit of a documentary investigation.

We review a district court's finding of obstruction of justice for clear error. See United States v. Pofahl, 990 F.2d 1456, 1481 (5th Cir. 1993). "A factual finding is not clearly erroneous as long as it is plausible in the light of the record as a whole." United States v. Cluck, 143 F.3d 174, 180 (5th Cir. 1998); see also United States v. Dixon, 132 F.3d 192, 201 (5th Cir. 1997). This is particularly true where a sentencing court's imposition of a § 3C1.1 enhancement is based, at least in part, upon an evaluation of a witness' credibility. See Johnson v. Collins, 964 F.2d 1527, 1532 (5th Cir. 1992) (stating that appellate court must show even more deference, when findings of fact are based on credibility determinations). After a considered review of the record, we find that the district court

did not commit clear error in imposing a § 3C1.1 enhancement for obstruction of justice.

### C. Use of Money Laundering Guidelines

Powers also contends that the district court erred in sentencing him under the money laundering guidelines instead of the fraud guidelines. The crux of Powers' argument is that a substantial disparity exists between the guideline range he would have confronted under the fraud guidelines in § 2F1.1 and the sentence he actually received under the money laundering guidelines in § 2S1.1. We find no merit to this argument.

The district court was required to "group" together Powers' fraud and money laundering offenses because those crimes involved the same victim and involved multiple acts that were linked by a common illegal objective or part of a common scheme. See United States v. Leonard, 61 F.3d 1181, 1185 (5th Cir. 1995) (noting that § 3D1.2(d) explicitly provides for grouping of offenses covered by the fraud and money laundering guidelines). Once grouped, the district court properly determined that money laundering produced the higher offense level and properly imposed sentence under that guideline, § 2S1.1. See Leonard, 61 F.3d at 1185 (explaining that because of the Guideline's grouping rules, where money laundering and fraud offenses can be properly grouped, the imposition of the higher base offense level attached to money laundering was required).

Powers next argues that the sentencing court should have departed downward in light of the severity of his sentence imposed under the money laundering guideline. Although a court

can choose to depart downward where the particular conduct falls outside the "heartland" of offenses considered by the Sentencing Commission, a court's refusal to grant a downward departure from the Guidelines may only be reviewed "if the refusal was based on a violation of the law." United States v. Palmer, 122 F.3d 215, 222 (5th Cir. 1997) (explaining that an appellate court has jurisdiction to review a trial court's refusal to grant a downward departure from the Sentencing Guidelines only if the district court's refusal to depart downward is premised upon the court's mistaken conclusion that the Guidelines do not permit such a departure); Leonard, 61 F.3d at 1185 (noting that failure to grant discretionary "heartland" departure is not subject to appellate review). Because our review of the record reveals no basis from which we could conclude that Judge Maloney erroneously believed that he lacked the authority to depart, his decision to not grant a downward departure is unreviewable on appeal.

## V. HONEST SERVICES THEORY

The indictment alleged, and the jury was instructed that Powers could have committed fraud under either of two theories. The first theory was that Powers obtained money or property through fraudulent means, in violation of 18 U.S.C. § 1341 (use of mail) and 18 U.S.C. § 1343 (use of wire). The second was that Powers deprived Oryx of its right to his honest services, in violation of 18 U.S.C. §§ 1341, 1343, and 1346. Because the jury convicted Appellant by a general verdict, we are unable to determine whether the jury embraced the first theory, the second, or both.

Nonetheless, Powers argues that his fraud convictions are invalid because the honest services theory does not apply to his conduct. Specifically, he contends that there was no proof that he intended to deprive Oryx of his honest services or that Oryx suffered any tangible harm. We note that Powers' attack on the applicability of the honest services theory, when stripped down to its essentials, is nothing more than an attack on the sufficiency of the evidence.

We need not, however, address this sufficiency question. As already mentioned, the case was submitted to the jury on two alternative, legally valid theories. If either theory was supported by sufficient evidence, we are bound to affirm. See Griffin v. United States, 502 U.S. 46, 56-60, 112 S.Ct. 466, 472-74 (1991); United States v. Manges, 110 F.3d 1162, 1172 (5th Cir. 1997). Because we have already found that Powers' mail fraud and wire fraud convictions are supported by sufficient evidence on the theory that he schemed to obtain money through false means, our inquiry ends here.

## VI. CUMULATIVE ERROR

Powers' final claim is that the cumulative effect of multiple errors throughout his trial resulted in a violation of his due process rights. Because the foregoing analysis has revealed no error, Powers has nothing to cumulate. See United States v. $ 9,041,598.68, 163 F.3d 238, 250 (1998) (discussing cumulative error analysis in the context of a forfeiture proceeding). We, therefore, deny Powers relief on his cumulative due process claim.

## VII.  Conclusion

For the above-stated reasons, we affirm both Powers'
conviction and sentence.

AFFIRMED.