

2002 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-15-2002

# USA v. $734,578.82

Precedential or Non-Precedential:

Docket No. 00-2500

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2002

Recommended Citation

"USA v. $734,578.82" (2002). *2002 Decisions.* Paper 277.
http://digitalcommons.law.villanova.edu/thirdcircuit_2002/277

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2002 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed April 15, 2002

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 00-2500

UNITED STATES OF AMERICA

v.

$734,578.82 IN UNITED STATES CURRENCY;
$589,578.82 IN UNITED STATES CURRENCY

AMERICAN SPORTS, LTD.; INTERCASH LTD. IOM,
        Appellants

On Appeal for the United States District Court
for the District of New Jersey
(Dist. Ct. No. 99-cv-00013)
District Judge: Hon. Katharine S. Hayden

Argued: July 30, 2001

Before: BECKER, Chief Judge, McKEE, Circuit Judge, and
WEIS, Senior Circuit Judge

(Opinion Filed: April 15, 2002)

        CLARK E. ALPERT, ESQ. (Argued)
        DAVID N. BUTLER, ESQ.
        ANDREW M. MOSKOWITZ, ESQ.
        Alpert Butler Sanders &
         Norton, P. C.
        The Alpert Professional Building
        449 Mt. Pleasant Avenue
        West Orange, NJ 07052
        Attorneys for Appellants


        ROBERT J. CLEARY, ESQ.
        United States Attorney
        MICHAEL A. HAMMER, ESQ.
         (Argued)
        Assistant United States Attorney
        970 Broad Street, Suite 700
        Newark, NJ 07102
        Attorneys for Appellee

OPINION OF THE COURT

McKEE, Circuit Judge.

American Sports Ltd. and Intercash Ltd. I.O.M appeal the
district court's grant of summary judgment in favor of the
government and the resulting final order of civil forfeiture of

United States currency seized from bank accounts established in relation to an illegal gambling business. See 18 U.S.C. S 1955. For the reasons that follow, we will affirm.

I. FACTUAL BACKGROUND[1]

Intercash Ltd. I.O.M. ("IOM") is a corporation operating in, and organized under the laws of, the Isle of Man. American Sports Limited ("ASL") and related companies are owned and operated by Gary Bowman.[2] ASL and its related companies operate in the United Kingdom under valid licenses issued by that government. Intercash Financial Services, Ltd. ("IFS-Canada"), is a Canadian corporation located in Toronto, Canada. Ivan and Juliana Olenych are members of the Board of Directors of IFS Canada. Although it is not readily apparent from the government's brief, when the government refers to "IFS" it means both IOM and IFS-

_____

1. The facts are not in dispute. By a Stipulation, dated December 3, 1999, the parties agreed that the facts are as pleaded in the Government's First Amended Verified Complaint of Forfeiture in Rem.

2. The related Bowman-owned sports betting companies are American Sports Betting Service, Sports Action International and International Sports Betting Corp.

Canada. See Government's Br. at 2. In the government's view, IOM and IFS-Canada are the same entity. IFS (i.e., IOM and IFS-Canada) was established with funds provided by Bowman and one of his companies, American Sports Betting Service. American Sports Betting Service is located in England.

Intercash Financial Services is a New Jersey corporation ("IFS-NJ") operating in South Bound Brook, New Jersey. It was incorporated in New Jersey in 1995 and its corporate records list Michael Sydor, Dennis Pokoyoway and Yar Jacobs as its district managers. IFS-NJ had three telephone numbers, but it was not listed in the New Jersey telephone books or Yellow Pages. Moreover, there are no hours of operation posted for IFS-NJ anywhere in the building where the office is located. Entry to IFS-NJ's office is controlled by an electronic buzzer inside the office. Telephone calls to the office are not answered in a manner that informs the caller that he/she has reached the offices of IFS-NJ. Rather, the phone is merely answered with a "hello."

Bowman promoted his companies on the Internet in advertisements claiming that the companies provided recreational betting services and accepted wagers on sporting events throughout the world. These advertisements detailed the wagering services that Bowman and his companies provided and explained that ASL provided a betting service and accepted wagers on most sporting events throughout the world. Most of Bowman's business

was derived from North American sports such as professional and college football and basketball games.3

Bowman's advertisements also explained how to remit money, set up an account and place bets. Funds were to be remitted via Western Union wire transfer for deposit in Fleet Bank, N.A., account number 2753-10-3191 to establish accounts and to place bets. ASL is the holder and beneficiary of that Fleet Bank account. Once a bettor established an account, he/she could then call Bowman's company in England via international toll-free telephone

_____

3. Bowman claims that most of his customers are from the United States and Canada.

numbers to confirm the deposits and to immediately begin gambling on various sporting events around the world.

Dennis Pokoyoway was IFS-NJ's district manager, ran its daily operations, and deposited funds received from bettors into Fleet Bank accounts 2753-10-4767 and 2753-10-3191. IFS-NJ received wire transfers of funds, ranging from $20 to at least $2,000, from bettors throughout the United States. The wire transfers were typically completed through Western Union where IFS-Canada/IOM maintained account number APH081580. IFS-NJ received and processed the wire transfers.

After IFS-NJ received a wire transfer, it deposited those funds into accounts maintained for the benefit of IFS-Canada/IOM and ASL, including Fleet Bank account number 27523-10-4767, maintained in the name of and/or for the benefit of IFS-Canada; and Fleet Bank account number 2753-10-3191, maintained in the name of and/or for the benefit of ASL.4

Large sums of money were regularly transferred from Fleet Bank account number 2753-10-4767 to 2753-10-3191. For example, in October of 1996, approximately $1.2 million was transferred, and another $550,000 was transferred in November of 1996. Funds in account number 2753-10-3191 were paid out to bettors all over the United States.

IFS-NJ also tallied the funds received on an hourly basis and sent the hourly tallies to Bowman in England. Bettors were therefore able to call ASL and other Bowman betting companies using the aforementioned international telephone numbers to confirm their deposits. This allowed them to place bets soon after wiring money to IFS-NJ.

Two examples cited by the government illustrate IFS-NJ's

_____

4. IFS-NJ deposited thousands of dollars each day into those accounts. These deposits represented wagers from numerous bettors across the

United States. For example, on December 9, 1996, Pokoyoway made deposits ranging from $2,000 to $15,000 for IFS-Canada. In addition, Western Union corporate security officers informed Federal Bureau of Investigation agents in October of 1996 that IFS-NJ had been sending Gary Bowman as much as $90,000 per day.

role in Bowman's gambling operations. The first is the case of Wisconsin bettor, Brian Taff, who sent $32,000 to IFS-NJ via Western Union. Taff 's telephone records revealed calls to Bowman in Manchester, England, and investigators subsequently discovered documents related to sports-betting in his garbage.[5] The government argues that it is reasonable to conclude that Taff wired the $32,000 to IFS-NJ so that he could place bets with Bowman. These funds were included in an accounting that IFS-NJ subsequently sent to Bowman. According to the government, Taff 's funds were eventually deposited into one of the accounts at Fleet Bank maintained by either ASL or IFS-NJ.

The government's second example is a confidential source that wired Western Union transfers to IFS-NJ to place sports bets of more than $25,000 during 1995. Although the confidential source was aware that the bets were forwarded to a gambling house in England, the source knew that his/her funds went through accounts handled by IFS-NJ.

On December 3, 1998, Pokoyoway (IFS-NJ's district manager), pled guilty in state court in New Jersey to charges of promoting gambling in the third degree, and conspiracy to promote gambling in the third degree. In doing so, he admitted that from August 1995 to approximately December 15, 1996, he deposited funds from Western Union wire transfers into Fleet Bank accounts owned by IFS and ASL. Pokoyoway told law enforcement agents that his duties for IFS-NJ included compiling the aforementioned hourly totals of all checks received by IFS-NJ and then informing IFS and Bowman (in England) of the amount of the deposits. According to Pokoyoway, IFS-NJ received well over $1,000 a day between August 1995 and

---

5. Although not relevant to our analysis, it is interesting to note that this entire forfeiture proceeding began fortuitously when agents of the Wisconsin Attorney General's Office informed New Jersey authorities that they had discovered sports-betting information in Taff 's garbage. The contents of his garbage were of interest to Wisconsin authorities because they suspected Taff 's involvement in narcotics. The documents in Taff 's garbage led to an international investigation into sports-betting that eventually involved the FBI, the Royal Canadian Mounted Police, and authorities in England and the United States.

December 15, 1996. He estimated that IFS-NJ averaged twenty to thirty Western Union wire transfers per day, for

a daily total of $4,000 to $5,000. He also acknowledged that he knew that the incoming funds were derived from sports gambling.

II. DISTRICT COURT PROCEEDINGS

This litigation began when FBI agents executed a warrant authorizing the search of IFS-NJ's office, and seizure of the contents of Fleet Bank Account number 2753-10-4647, in the name of and/or for the benefit of, IOM and ASL. The warrant also authorized the seizure of all funds received by Fleet Bank for three days after service of the warrant. Thereafter, agents executed a warrant authorizing seizure of the contents of Fleet Bank account number 2753-10-3191, maintained in the name of, and/or for the benefit of, ASL. This warrant also authorized seizure of funds deposited into the account for the three days following execution of the warrant.

Pursuant to these warrants, agents seized $77,660.62 from account number 2753-10-4767 and $268,426.59 from account number 2753-10-3191. The next day, agents obtained a warrant to seize Western Union account number APH081580 in the name of, and/or for the benefit of, IOM. Agents seized an additional $243,491.61 from that account.

Approximately three years later, the government filed the instant civil in rem forfeiture action against those funds. Count I of the complaint alleged criminal violations of 18 U.S.C. S 1955, and sought civil forfeiture pursuant to 18 U.S.C. S 1955(d). Count II alleged violations of 18 U.S.C. S 1956, and sought forfeiture pursuant to 18 U.S.C. S 981. Count III alleged violations of 18 U.S.C. S 1957, and sought forfeiture pursuant to 18 U.S.C. S 981.6

---

6. The government subsequently filed a First Amended Verified Complaint in which it clarified that the actual amount of currency was $489,578.82. Apparently, $145,000 had been withdrawn from Fleet Bank account number 2853-10-4767 after agents served the warrant, but before the bank tendered the proceeds to the government.

6

Following receipt of notice of the forfeiture action, IOM filed a verified claim to the property seized from Fleet Bank account number 2753-10-4647 and Western Union account number APH081580. ASL filed a verified claim for the property seized from Fleet account number 2753-10-3191. The parties eventually stipulated to the facts as pleaded in the government's first amended complaint. Thereafter, both sides moved for summary judgment. The district court granted the government's motion for summary judgment on Count I (seeking forfeiture under S 1955(d) for violations of S 1955), but declined to enter judgment on Counts II and III because all of the currency was forfeited under Count I, and the remaining Counts were therefore moot. The court filed a Final Order of Forfeiture on July 24, 2000, and this appeal by IOM and ASL (hereinafter collectively referred to

as "Claimants") followed.

III. DISCUSSION

18 U.S.C. S 1955 provides in relevant part:

>      (a) Whoever conducts, finances, manages, supervises,
>      directs, or owns all or part of an illegal gambling
>      business shall be fined under this title or imprisoned
>      not more than five years, or both.
>
>      (b) As used in this section--
>
>      (1) "illegal gambling business" means a gambling
>      business which--
>
>      (i) is a violation of the law of a State or political
>      subdivision in which it is conducted;
>
>      (ii) involves five or more persons who conduct,
>      finance, manage, supervise, direct, or own all or part of
>      such business; and
>
>      (iii) has been or remains in substantially continuous
>      operation for a period in excess of thirty days or has a
>      gross revenue of $2,000 in any single day.

18 U.S.C. S 1955(a), (b)(1)(i) - (iii). The term "gambling"
"includes but is not limited to pool-selling, bookmaking,
maintaining slot machines, roulette wheels or dice tables,
and conducting lotteries, policy, bolita or numbers games,

or selling chances therein." 18 U.S.C. S 1955(2). The statute
also authorizes civil forfeiture as follows: "[a]ny property,
including money, used in violation of the provisions of
[S 1955] may be seized and forfeited to the United States."
18 U.S.C. S 1955(d).

A. Burden of Proof in S 1955(d) Civil Forfeiture
        Proceedings.

The government bears the initial burden in a forfeiture
proceeding under S 1955. See United States v. On Leong
Chinese Merchants Ass' n Bldg., 918 F.2d 1289 (7th Cir.
1990).

>      The government's burden in a [S 1955(d)] civil forfeiture
>      is merely to establish probable cause to believe that the
>      defendant property is subject to forfeiture. Probable
>      cause is defined as reasonable ground for the belief of
>      guilt supported by less than prima facie proof but more
>      than mere suspicion. Of course, probable cause must
>      be demonstrated with respect to every essential
>      element of the alleged violation. Once the government
>      demonstrates probable cause . . . the ultimate burden
>      shifts to the claimant to prove by a preponderance of
>      the evidence that the property is not subject to

    forfeiture.

Id. at 1292 (citations and internal quotations omitted). This
is identical to the burdens imposed for civil in rem
forfeitures under 21 U.S.C. S 881(a)(6). Thus, in relying
upon On Leong, we are merely applying our understanding
of the burden-shifting procedure described in 19 U.S.C.
S 1615 to this civil forfeiture action brought pursuant to 18
U.S.C. S 1955(d). See United States v. $10,700.00, 258 F.3d
215, 222 (3d Cir. 2001).

If the government satisfies its burden of proof, and the
party opposing forfeiture fails to establish that the property
is not subject to forfeiture, forfeiture will be ordered
regardless of the culpability of the claimant. "[T]he presence
or involvement of the claimant is simply immaterial" to the
government's right to seek forfeiture. Id. at 1293.7

_____

7. Forfeitures under S 1955 therefore differ from forfeitures under the
Comprehensive Drug Abuse Prevention and Control Act, 21 U.S.C. S 881

8

        The language of [S 1955(d)] does not condition forfeiture
        on any suggestions that the claimant itself directed or
        managed the illegal gambling operation. [Rather,] [i]t
        authorizes the forfeiture of 'any property . . . used in
        violation of the provisions of this section.' Though one
        of the preceding subsections does make it illegal to
        'conduct, finance, supervise, direct, or own all or part
        of an illegal gambling business' . . . the forfeiture
        subsection is not limited . . . to property owned by
        those who themselves conduct or oversee illegal
        gambling businesses.

Id. at 1293 (citations omitted)(emphasis in original). This
disjuncture between criminal culpability and exposure to
forfeiture arises from a legal fiction. " 'Traditionally,
forfeiture actions have proceeded upon the fiction that
inanimate objects themselves can be guilty of wrongdoing.' "
Id. (quoting United States v. U. S. Coin and Currency, 401
U.S. 715, 719 (1971)). Therefore, "the object itself is the
formal defendant." Id. Thus, "forfeiture can be ordered even
in the absence of any wrongdoing on the claimant's part."
Id; see also United States v. Sandini, 816 F.2d 869, 872 (3d
Cir. 1987) ("Civil forfeiture is an in rem  proceeding. The
property is the defendant in the case. . . . The innocence of
the owner is irrelevant -- it is enough that the property was
involved in a violation to which forfeiture attaches.").8

B. The Government's Showing of Probable Cause.

18 U.S.C. S 1955(b)(1)(i) first looks to relevant state law to

_____

et seq. (West 1981 & Supp. 1984). "Congress engrafted an 'innocent
owner' defense to forfeiture under SS 881(a)(4), (6) and (7).' " United States
v. One 1973 Rolls Royce, 42 F.3d 794, 799 (3d Cir. 1994).

8. But see Calero-Toledo v. Pearson Yacht Leasing Co., 416 U.S. 663, 689 (1974), suggesting in "now-famous dicta that Fifth Amendment just compensation concerns might preclude a judge from ordering forfeiture if the owner proves 'he was uninvolved and unaware of the wrongful activity, but also that he had done all that reasonably could be expected to prevent the proscribed use of his property.' " United States v. On Leong Chinese Merchants Ass'n Bldg., 918 F.2d 1289, 1293 n.3. (7th Cir. 1990).

determine whether a given activity constitutes gambling. Here, the alleged illegal activity occurred in New Jersey. Therefore, "[t]he relevant burden of proof requires merely that the government establish probable cause to believe that [New Jersey] gambling laws were being violated." On Leong, 918 F.2d at 1293.

The relevant New Jersey law here is set forth at N.J.S.A. 2C:37-2. That statute makes it a crime to engage in "promoting gambling," and provides that:

> [a] A person is guilty of promoting gambling when he knowingly:
>
> (1) Accepts or receives money or other property, pursuant to an agreement or understanding with any person whereby he participates or will participate in the proceeds of gambling activity; or
>
> (2) Engages in conduct, which materially aids any form of gambling activity. Such conduct includes but is not limited to conduct directed toward the creation or establishment of the particular game, contest, scheme, device or activity involved, toward the acquisition or maintenance of premises, paraphernalia, equipment or apparatus therefor, toward the solicitation or inducement of persons to participate therein, toward the actual conduct of the playing phases thereof, toward the arrangement of any of its financial or recording phases, or toward any other phase of its operation.

N.J.S.A. 2C:37-2a(1), (2) (emphasis added). Moreover, "gambling" is defined to include "staking or risking something of value upon the outcome of a contest of chance or a future contingent event not under the actor's control or influence, upon an agreement or understanding that he will receive something of value in the event of a certain outcome." N.J.S.A. 2C:37-1b.

Given the breadth of this definition, we agree that the government clearly established probable cause to believe that IFS-NJ was "promoting gambling" in violation of New Jersey law by materially aiding Bowman's gambling enterprises.9 IFS-NJ was a integral component of Bowman's gambling enterprise. It received funds from bettors

9. As noted earlier, see supra n.1, the government and the Claimants stipulated that the facts are as stated in the government's first amended complaint.

throughout the United States and processed those transfers so that the bettors could open accounts and place bets with ASL and other Bowman companies. It sent Bowman an hourly accounting of these funds. This allowed Bowman to monitor betting income and it also allowed bettors to call ASL and Bowman to confirm their deposits and place bets. IFS-NJ was also part of the payout mechanism that ensured that winning bettors collected on their wagers. IFS-NJ clearly "[e]ngage[d] in conduct, which materially aid[ed] . . . gambling activity." Its conduct was "directed . . . toward the arrangement of [the gambling activity's] financial or recording phases." N.J.S.A. 2C:37-2a(2).

Even though the stipulated facts support the legal conclusion that IFS-NJ promoted gambling under New Jersey law, Claimants nonetheless argue that the government failed to establish probable cause. They argue instead that the seizure and forfeiture here "represent[ ] a prosecutorial excess." Claimants' Br. at 11. Their argument is largely based upon the generally accepted conflict of laws principle that a gambling transaction occurs in the country where the bet or wager is accepted. Id. at 13-14 (quoting Dicey & Morris, The Conflict of Laws 1468 (1993)). They insist that the gambling transactions here actually occurred in England where the bets were ultimately "accepted." Claimants insist that there was no illegal gambling activity at all in this case because gambling is legal in England, and all of the actors there were legally licensed to conduct a gambling business. According to Claimants, IFS-NJ merely "performed a facially, neutral, ministerial function in the United States." Id. at 10. They attempt to buttress this claim by reminding us that IFS-NJ "was not open to the public, listed in any telephone directory, or identified in any advertising material as a place where bets could be placed." They are also quick to point out that the company's "operations did not include fixing odds, declaring winners or losers, or accepting or relaying bets or wagers." Id. at 5, 12. Claimants largely rest this argument on three cases which we will discuss in turn.10

_____

10. Claimants cite a host of cases from various states dealing with gambling. However, we do not believe that any of them are helpful for the

The first is State v. Andreano, 285 A.2d 229 (N. J. App. Div. 1971). There, the defendant was charged with bookmaking and gambling in violation of New Jersey law. His defense at trial was that he was not a bookmaker at all. Rather, he argued that he was simply acting as a

messenger who took others' bets to a legal, in-state pari-mutuel race track as a favor. The trial judge instructed the jury that under the New Jersey law, "bookmaking" occurs whenever an individual accepts a bet from another with the intent of subsequently placing the bet at a pari-mutuel race track, irrespective of whether that individual acts only as a conduit and does not benefit from the transaction. On appeal, the Appellate Division reversed the conviction based upon that instruction. That court held that "when the bet is taken by a disinterested individual for placement at a lawful race meeting, such activity is not bookmaking within the statutory prohibition." Id. at 231.

Claimants contend that, under Andreano, "mere[ly] handling . . . funds, [which are] destined for a lawful location inside or outside the State, does not constitute an unlawful gaming activity." Claimants' Br. at 23. Since IFS-NJ only transferred funds to England, where the relevant parties were duly licensed and gambling is legal, Claimants insist that IFS-NJ could not have engaged in illegal gambling activity under New Jersey law.

However, Claimants' reading of Andreano is far too narrow. Andreano was charged with "bookmaking," and the government here is not claiming that IFS-NJ's operations constituted bookmaking under New Jersey law. Moreover, the statute under which Andreano was charged has since been repealed. That earlier statute did not prohibit "promoting gambling" as current law does. The government's forfeiture claim rests upon an assertion that IFS-NJ promoted gambling as currently defined in N.J.S.A.

_____

simple reason that the government's seizure and forfeiture is predicated upon its claim that IFS-NJ violated New Jersey statutory law. Thus, the issue is whether the government had probable cause to believe that IFS-NJ's activities promoted gambling as defined in the New Jersey statute, not whether the government had probable cause to believe that IFS-NJ's operations would have been illegal under British law.

12

2C:37-2, and Andreano does not assist the Claimants in that regard.11

The second case Claimants rely upon is United States v. Truesdale, 152 F.3d 443 (5th Cir. 1988). The gambling operation in Truesdale was strikingly similar to the operation here. There, World Sportsbook ("WSB") operated a gambling business in the Dominican Republic, Jamaica, and in Dallas, Texas. Its operations were legal in Jamaica and the Dominican Republic. Bettors placed bets by calling WSB's Jamaican and Dominican offices, and those offices accepted and processed the wagers. Bets could only be placed via "offshore" telephone numbers. However, WSB opened accounts by sending funds to its Dallas office via Western Union wire transfer or overnight delivery. WSB employees in the Dallas office received these funds and deposited them into various bank accounts in and around

Dallas for WSB.

The federal government successfully prosecuted WSB's Dallas employees for illegal gambling in violation of 18 U.S.C. SS 1955 and 1955(b)(1)(i). The government charged that the employees were guilty of "bookmaking," under Texas Penal Code S 47.01(2)(A)-(C), and that this constituted a violation of S 1955. Section 47.01(2)(A)-(C) of the Texas Penal Code made it a crime to receive, record, or forward: (1) more than 5 bets or offers to bet in a day; or (2) more than $1,000 in a day; or (3) to scheme to receive, record, or forward a bet or an offer to bet. However, the Court of Appeals for the Fifth Circuit reversed the defendants' convictions. The court held that there was

_____

11. Claimants argue that Andreano is still significant because even though the statue Andreano was charged with violating was repealed, it was replaced by the statute at issue here. Claimants maintain that we should be guided by the repealed bookmaking statute when interpreting N.J.S.A. 2C:37-2. Reply Br. at 9. This argument ignores the fact that the relevant statute in Andreano did not prohibit "promoting of gambling," and we certainly cannot ignore the difference in the language between the old and new statutes. "The starting point for interpreting a statute is the language of the statute itself. Absent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive." Temple Univ. v. United States , 769 F.2d 126, 132 (3d Cir. 1985).

13

insufficient evidence that the defendants engaged in bookmaking under Texas law merely by accepting bets in Texas. The court's holding was based upon its conclusion that the actual bookmaking (i.e. accepting bets), actually occurred in the Dominican Republic and Jamaica where it was legal.

Truesdale does, at first blush, support Claimants' position because here, as in Truesdale, bets were actually "placed" outside of the United States in a jurisdiction where betting was legal and where the betting business was properly licensed. However, the defendants in Truesdale were charged with bookmaking, and the government's averments here are not analogous. Rather, the government alleges that IFS-NJ was "promoting gambling" under a New Jersey statute that prohibits conduct "which materially aids any form of gambling activity," N.J.S.A. 2C:37-2a(2).

Moreover, upon a closer reading, Truesdale actually undermines Claimants' position. In Truesdale, bookmaking was only one of five activities defined as "gambling promotion" under Texas law. Section 47.03(a)(3) of the Texas Penal Code made it a separate offense for an individual to "become[ ] a custodian of anything of value bet or offered to be bet[ ]" for gain. However, the indictment in Truesdale did not allege that conduct as a predicate for the federal prosecution under S 1955. It only broadly alleged bookmaking. Therefore, "the fact that the [defendants had]

engaged in financial transactions in the State of Texas that may have run afoul of Section 47.03(a)(3) [was] irrelevant." 152 F.3d at 447. Nevertheless, in Truesdale, the government argued that the convictions could be upheld because the underlying financial transactions "were an essential part of the operation." Id. at 449. The court of appeals rejected that argument, saying:

> The government maintains that these financial transactions were an essential part of the operation. It may be true that these financial transactions were essential to the overall operation, but they do not establish an essential element of the crime of "bookmaking" as it is defined by Texas law. The Texas bookmaking statute prohibits recording, receiving, and forwarding bets; where and how the money is paid out

14

> is irrelevant under section 47.03(a)(2). Becoming a custodian of money that is used to place bets offshore would be a violation of section 47.03(a)(3). However, the indictment did not allege that the appellants violated section 47.03(a)(3) and the jury was not instructed on any such violation. Nor was the case tried on that theory. In short, the government's case and the jury's verdict were focused exclusively on illegal bookmaking, and we cannot affirm the case on a different theory.

Id. at 449 (emphasis added). The highlighted portion of this statement is dicta, but it illustrates the distinction between the circumstances in Truesdale, and the circumstances here.

The third case Claimants rely upon is California v. Cabazon Band of Mission Indians, 480 U.S. 202 (1987). Claimants argue that Cabazon stands for the proposition that one sovereign cannot criminalize gambling activity that is legal under the laws of another sovereign. However, Cabazon is even less helpful to Claimants than Truesdale. Cabazon was concerned with whether Congress intended to allow state laws to apply on Indian reservations. The precise issue was whether a state could apply its gambling laws to bingo games held on Indian reservations. Id. at 207-212. In resolving that issue the court merely stated that nothing in the Organized Crime Control Act (which includes S 1955) permits the states to enforce federal gambling laws against Indian tribes. Id. at 213-14. This unique case involving tribal sovereignty in no way furthers our inquiry into whether IFS-NJ promoted gambling as defined under applicable New Jersey law.

Given the language of the relevant statute here, we conclude that the government established probable cause that IFS-NJ's conduct violated New Jersey's law against promoting gambling, and the government therefore satisfied its burden of proof with regard to the first element of S 1955(b)(1)(i).

However, the government must establish probable cause as to every essential element of S 1955(b)(1), On Leong, 918 F.2d at 1292, and Claimants allege that the government ignored the second and third elements of that statute. The

government insists that Claimants never raised this argument in the district court, and the Claimants do not argue to the contrary. Nor do they elaborate on their statement that the government ignored the remaining elements here. Rather, Claimants merely make the general assertion that IFS-NJ was not an illegal gambling business and, the defendant funds were therefore not subject to seizure and forfeiture. Reply Br. at 16.

We generally do not address issues that are raised for the first time on appeal. Harris v. City of Philadelphia, 35 F.3d 840, 845 (3d Cir. 1994) ("This Court has consistently held that it will not consider issues that are raised for the first time on appeal.").12 Here, however, the parties have entered into a stipulation which allows us to readily dismiss this additional claim. If we assume arguendo that Claimants have not waived this argument, it is clear that the stipulated facts enable the government to satisfy its burden under the second and third elements of SS 1955(b)(1)(ii) and (iii).

The second element of S 1955(b)(1) requires that the "illegal gambling business . . . involve[ ] five or more persons who conduct, finance, manage, supervise, direct or own all or part of such business." 18 U.S.C.S 1955(b)(1)(ii). A person " 'conducts' an illegal gambling business [under the statute] by performing any necessary function in the gambling operation, other than that of a mere bettor." United States v. Miller, 22 F.3d 1075, 1077 (11th Cir. 1994)(citation omitted). Here, the parties stipulate that each of the following seven people conducted the gambling business: Dennis Pokoyoway, Michael Sydor, Yar Jacobs, Juliana Olenych, Ivan Olenych, Katharine Sobczak and Gary Bowman.13

---

12. An exception to this general principle exists"in the horrendous case where a gross miscarriage of justice would occur" if we did not consider an issue not raised in the district court. Newark Morning Ledger v. United States, 539 F.2d 929, 932 (3d Cir. 1967).

13. Pokoyoway, Sydor and Jacobs were district managers for IFS-NJ. Pokoyoway oversaw IFS-NJ's daily operations and deposited funds received from bettors into bank accounts maintained for the benefit of IOM and ASL. Sydor signed the Quick Chek Service application to

The third element requires that the gambling operation "has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue

of $2,000 in any single day." 18 U.S.C. S 1955(b)(1)(iii). The facts as stipulated to in the first amended complaint establish that IFS-NJ was in operation for more than 30 days, and that IFS-NJ received more than $2,000 in a single day.

Claimants' argue that the district court erred in considering Pokoyoway's state convictions and admissions he made during his guilty plea colloquy when determining if the government satisfied its burden. Inasmuch as the conviction and colloquy came after the initial seizure of currency, Claimants maintain that they can not possibly furnish probable cause for a seizure that already occurred. Claimants' Br. at 1.

The second paragraph of S 1955(d)14   incorporates the

_____

Western Union and received bills sent to IFS-NJ. Ivan and Juliana Olenych were members of the board of IFS-Canada. They set up IFS-NJ and recruited and hired Pokoyoway. Sobczak helped Pokoyoway with bookkeeping, preparing deposits and faxing information to Bowman in England. Finally, Bowman owned, funded, operated and promoted the gambling enterprises that IFS-NJ served. Of the seven individuals, only two -- Pokoyoway and his girlfriend, Sobczak,-- were actually present in New Jersey. Bowman was in England and the other four were in Canada.

Claimants argue that each of the people needed to meet the second element under S 1955(1) must be present in the United States. However, they cite no authority for that proposition and we have found none. The government does not respond to that assertion other than listing these seven individuals and stating that this is sufficient to satisfy the second element. We agree.

As we have discussed, the offending conduct occurred in New Jersey, and nothing in S 1955 suggests that Congress intended to require all of the persons involved in an "illegal gambling business" to be located inside of the United States so long as the other conditions of the statute are satisfied. Moreover, no such requirement arises under the Commerce Clause. See United States v. Boyd, 149 F.3d 1062, 1066 (10th Cir. 1998). Accordingly, we reject Claimants' position.

14. Which provides: "All provisions of law relating to the seizures, summary, and judicial forfeiture procedures, and condemnation of

17

burden of proof required for customs forfeitures under 19 U.S.C. S 1615.15 The claimant in a proceeding under S 1615 bears the ultimate burden, however, "probable cause [must] first be shown for the institution of such suit or action." There is a circuit split as to whether the government must demonstrate that probable cause existed before it initiated forfeiture proceedings under S 1615, or whether the government can demonstrate probable cause by relying upon evidence it was unaware of until after proceedings began. Compare United States v. $191,910.00 in U. S. Currency, 16 F.3d 1051, 1066 (9th Cir. 1994) (prohibiting

the use of "after-acquired evidence"); United States v. $91,960.00, 897 F.2d 1457, 1462 (8th Cir. 1990) (same), with United States v. Premises and Real Property at 4492 S. Livonia Road, 889 F.2d 1258, 1268 (2d Cir. 1989)(stating that "after-acquired evidence" can support probable cause); United States v. $67,220.00 in United States Currency, 957 F.2d 280, 284 (6th Cir. 1992) (adopting Livonia ).

Pokoyoway pled guilty to the state gambling charges on December 3, 1998. See First Amend. Compl. atP 59. However, the government did not file its forfeiture

---

vessels, vehicles, merchandise, and baggage for violation of the customs laws; the disposition of such vessels, vehicles, merchandise, and baggage or the proceeds from such sale; the remission or mitigation of such forfeitures; and the compromise of claims and the award of compensation to informers in respect of such forfeitures shall apply to seizures and forfeitures incurred or alleged to have been incurred under the provisions of this section, insofar as applicable and not inconsistent with such provisions. Such duties as are imposed upon the collector of customs or any other person in respect to the seizure and forfeiture of vessels, vehicles, merchandise, and baggage under the customs laws shall be performed with respect to seizures and forfeitures of property used or intended for use in violation of this section by such officers, agents, or other persons as may be designated for that purpose by the Attorney General." 18 U.S.C. S 1955(d).

15. The second sentence of 18 U.S.C. S 1995(d) states: "[a]ll provisions of laws relating to the seizures, . . . and judicial forfeiture procedures, . . . of vessels, vehicles, merchandise, and baggage for violation of the customs laws; . . . shall apply to seizures and forfeitures . . . incurred under the provisions of this section, insofar as practicable and not inconsistent with such provisions."

18

complaint until January 4, 1999. Therefore, if we conclude that forfeiture begins with the filing of the forfeiture complaint, Pokoyoway's plea would not be "after-acquired evidence," and there is no issue as to whether his conviction and admissions he made during his plea colloquy can establish the probable cause necessary to support the forfeiture. On the other hand, since the Fleet Bank accounts were seized in December 1996, Pokoyoway's conviction and plea colloquy statements would be"after-acquired evidence."

We have not yet addressed this issue directly. However, we have addressed the question in the context of a civil forfeiture under 21 U.S.C. S 881. In United States v. Ten Thousand Seven Hundred Dollars and No Cents ($10,700.00), 258 F.3d 215 (3d Cir. 2001), we stated: "[T]he government bears the burden of establishing . . . probable cause to believe that the currency was subject to forfeiture at the time that it filed the forfeiture complaints in the District Court." Id. at 222 (emphasis added). Our analysis was based upon our reading of the respective burdens of proof for customs seizures under 19 U.S.C. S 1615. As

noted above, the same standard applies to forfeitures under S 1955 because S 1955(d) incorporates the procedures for customs forfeitures into the gambling statute. That controls our inquiry here, and we therefore hold that probable cause must exist to support the forfeiture when the government files the forfeiture complaint.16

As noted above, Pokoyoway pled guilty on December 3, 1998, and the government filed its forfeiture complaint approximately one month later on January 4, 1999. 17 Therefore, admissions Pokoyoway made during his change

_____

16. This view avoids the obvious questions of fundamental fairness that would rise from the government attempting to have a court order forfeiture without first having an adequate factual basis to support the request.

17. As noted, the government filed a first amended complaint on March 25, 1999 to correct the amount of the defendant currency and the Fleet Bank account numbers.

of plea colloquy were properly considered in the course of the subsequent forfeiture proceedings under S 1955(d).18

Since the government met its burden of establishing probable cause that the currency was subject to forfeiture, the burden shifted to Claimants to establish by a preponderance of the evidence that the property was not subject to forfeiture. On Leong, 918 F.2d at 1292. ("Once the government demonstrates probable cause in a forfeiture case, the ultimate burden shifts to the claimant to prove by a preponderance of the evidence that the property is not subject to forfeiture.").

C. The Claimants' Burden.

Although Claimants make several arguments in opposing forfeiture, most if not all of those arguments can be reduced to a subset of Claimants' main contention that IFS-NJ's activities in New Jersey cannot be illegal because all of the gambling occurred in England, where the relevant actors were properly licensed to engage in this activity. They maintain that the New Jersey gambling statute does not apply in England where the bets were accepted. They cite no authority for their basic proposition other than the testimony of various experts on the legislative history and intent of New Jersey's gambling statutes.

Claimants' experts testified that N.J.S.A. 2C:37-2"was always intended to apply . . . to the promotion of'illegal' gambling only, not gambling under a governmental license."

_____

18. Claimants cite United States v. One Single Family Residence Located at 18755 North Bay Road, Miami, 13 F.3d 1493 (11th Cir. 1994) in stating that Pokoyoway's conviction "has no significance here, where

there was no testimony." Claimants' Br. at 1. However, One Family Residence turned on the district court's erroneously concluding that a spouse was estopped from challenging a forfeiture petition filed against a residence owned by husband and wife as tenants by the entireties. The Court of Appeals for the Eleventh Circuit reversed because the wife had not been a party to her husband's criminal trial and therefore was not estopped from challenging any of the factual determinations her husband's conviction was based upon. The government's probable cause showing here is based upon Pokoyoway's own admissions during his plea colloquy. Government's Br. at 26.

20

See Appellants' Br. at 8. Claimants' experts testified that the district court's interpretation of the statute would criminalize such things as legitimate interstate banking and advertising relationships. Id. Although Claimants' argument has some appeal, it ignores the text of New Jersey's statute. That statute prohibits "conduct, which materially aids any form of gambling activity," and the scope of that language is illustrated by the New Jersey Appellate Division's analysis in State v. Fiola, 576 A.2d 338 (N. J. App. Div. 1990).

The business in Fiola "involve[d] the solicitation and receipt of money in New Jersey for the purchase of lottery tickets issued by other states, the transport of money to other states to purchase lottery tickets and the return of the tickets to New Jersey for delivery to customers." Id. at 339. The New Jersey Attorney General petitioned to enjoin the defendants' business alleging that it violated the state's constitutional and statutory prohibitions against gambling. The trial court refused to grant an injunction, but the Appellate Division reversed. That court held that even though the defendants' criminal culpability was not at issue, their "transport of gambling requests and money to out-of-state gambling sites and the return of lottery tickets to New Jersey gamblers 'materially aids [a] form of gambling activity' within the intent of N.J.S.A. 2C:37-2(a)(2)." Id. at 340. The Appellate Division held that the defendants' mere "possession of lottery tickets for distribution to their customers violates N.J.S.A. 2C:37-2(a)(2)." Id.

Therefore, even if we accept Claimants' argument that the gambling occurred outside of New Jersey where it is legal, their activity inside of New Jersey was nevertheless illegal because it promoted a gambling enterprise. Claimants' argument requires that we ignore the wording of the statute as well as relevant decisions of New jersey appellate courts that have interpreted it. We will do neither. In fact, despite Claimant's insistence that we view IFS-NJ's conduct through the narrowest of lenses, it is clear to us that the conduct here exemplifies the breadth of the statute.

Similarly, we reject Claimants' assertion that the district court applied New Jersey criminal law extraterritorially contrary to the limitations to specific provisions of the New

21

Jersey Crimes Code. See N.J.S.A. 2C:1-3a(1)-(6). More specifically, Claimants argue that under N.J.S.A. 2C:1-3a(4) New Jersey's prohibition against promoting gambling can not be applied to IFS-NJ's conduct inside of New Jersey unless that conduct is also illegal in England. See N.J.S.A. 2C:1-3a(4).

This argument ignores the critical fact that New Jersey has not attempted to prosecute IFS-NJ for violating its promoting gambling statute. Rather, the United States government has instituted civil forfeiture proceedings based upon IFS-NJ's violation of 18 U.S.C. S 1955. As noted above, S 1955 is a criminal statute that is part of the Organized Crime Control Act. That Act is "a federal law that, among other things, defines certain federal crimes over which the district courts have exclusive jurisdiction." Cabazon Band of Mission Indians, 480 U. S. at 213. We are therefore concerned with an exercise of federal, not state, authority. Moreover, as noted above, the forfeiture action is predicated solely upon conduct that occurred in New Jersey. Claimants are therefore actually arguing that the laws of England insulate them from forfeiture based upon their conduct in New Jersey.[19] We reject that argument.

The Claimants next argue that this forfeiture proceeding is essentially being waged against an innocent, foreign citizen and his gambling companies. However, this action does not turn on the culpability of Bowman or his British or Canadian companies. Moreover, as we noted earlier, forfeiture is not conditioned upon the culpability of the owner of the defendant property. We reiterate: the "innocence of the owner is irrelevant" in a civil forfeiture proceeding. Sandini, 816 F.2d at 872. Therefore, the legality and/or licensure of the businesses in England is simply irrelevant to the issues raised in the instant forfeiture proceeding.[20]

---

19. Inasmuch as IFS-NJ's accounts are subject to forfeiture based solely upon IFS-NJ's conduct, this case does not raise any issue of whether IFS-NJ is the alter ego of Bowman or his companies in Canada or the United Kingdom as Claimants suggest. See Claimants' Br. at 6.

20. As we noted in United States v. Sandini , civil in rem forfeiture proceedings "enjoy a venerable history and existed in Mosaic law if not

22

Claimants' also attempt to draw substance from the rule of lenity. "The main function of the rule of lenity is to protect citizens from the unfair application of ambiguous punitive statutes." United States v. Thompson/Center Arms Co., 504 U. S. 505, 525 (1992) (Stevens, J., dissenting). Therefore, where a statute is punitive in nature, the rule of lenity requires that any ambiguity in the statute be resolved in favor of the claimant. One 1973 Rolls Royce , 43 F.3d at 801. Claimants argue that even if a "technical violation of

S 1955 could have been made out," the rule of lenity nevertheless precludes forfeiture under the circumstances here. Claimants' Br. at 26. This argument is twofold. First, Claimants seize upon the district court's statement that "there is no law directly defining the criminality of the conduct in question." App. at 9. Second, they argue that the district court incorrectly held that the rule of lenity does not apply to civil forfeiture proceedings. They insist that this forfeiture was punitive and therefore the rule of lenity should apply.21

We interpret the first prong of this argument as an assertion that the district court believed that there was no New Jersey case law from which it could determine if IFS-NJ's activities constituted a violation of N.J.S.A. 2C:37-2a(2). However, the rule of lenity applies only if there is a "grievous ambiguity or uncertainty in the statute." Muscarello v. United States, 524 U.S. 125, 138 (1998)(citation and internal quotations omitted). The

_____

in other ancient codes as well." 816 F.2d at 872. Therefore, "[h]owever inapplicable its original justification may be today, in rem, or civil forfeiture, has become 'too firmly fixed in the punitive and remedial jurisprudence of the country to be now displaced.' " Id. (quoting Goldsmith-Grant Co. v. United States, 254 U. S. 505, 511 (1921)).

21. While civil forfeitures are usually not regarded as punishment, Sandini, at 872-873, certain kinds of civil forfeitures can indeed be punitive. In Austin v. United States, 509 U. S. 602, 619-620 (1993), the Court held that civil drug forfeitures under 21 U.S.C. SS 881(a)(4) and (7) are punishment under the Eight Amendment's Excessive Fines Clause. See also United States v. One 1973 Rolls Royce, 43 F.3d 794, 819 (1994)(Section 881(a)(4) forfeiture "is punitive and quasi-criminal in nature.").

23

parameters of New Jersey's prohibition against promoting gambling are not ambiguous, and they are certainly not "grievous[ly]" ambiguous. New Jersey's statute plainly includes conduct that materially aids any form of gambling activity, and it even provides examples of such conduct. This portion of Claimants' argument really does not implicate the rule of lenity as much as it simply reiterates their belief that IFS-NJ's activities are beyond New Jersey's reach because the bets were accepted in England.

Moreover, the mere possibility that New Jersey's promoting gambling statute lends itself to a more narrow interpretation than the district court allowed (or that the New Jersey court gave it in Fiola), does not trigger the rule of lenity. Smith v. United States, 508 U. S. 223, 240 (1993) (Noting that the possibility of articulating a narrower construction of a statute does not make the rule of lenity applicable).

We also reject the second prong of Claimants' rule of lenity argument; the district court's statement that the rule

does not apply in a civil proceeding. That was not the district court's holding. Rather, the district court merely noted that Claimants had failed "to cite any authority for the argument that the rule of lenity is applicable in a forfeiture proceeding because of criminality of the underlying conduct may be a matter of dispute." App. at 13. We have held that the rule of lenity does apply in a civil forfeiture proceeding when the nominally civil forfeiture statute is actually "punitive and quasi-criminal in nature." One 1973 Rolls Royce, 43 F.3d at 819.

However, even when the punitive nature of a civil forfeiture is sufficient to apply the rule of lenity, the rule will still not apply where there is little more than a suggestion of ambiguity. "[M]ost statutes are ambiguous to some degree . . . . [however,] the rule of lenity only applies if, after seizing everything from which it can be derived, we can make no more than a guess as to what Congress intended." United States v. Muscarello, 524 U.S. at 138 (citations and internal quotations omitted). "[A]s is true of any guide to statutory construction, [the rule] only serves as an aid for resolving an ambiguity; it is not to be used to beget one." Callanan v. United States, 364 U.S. 587, 596

(1961). "The rule comes into operation at the end of the process of construing what Congress expressed, not at the beginning . . . ." Id. Here, we have no problem determining Congress's intent from the text of S 1955(1).

The Claimants' rule of lenity objection to this proceeding is nothing more than an invitation to read ambiguity into an unambiguous statute based on their perception that it is being applied unfairly. We will not accept Claimants' invitation to manufacture an ambiguity merely to achieve a result which they believe is fairer than the result required by the breadth of the statute.

Claimants' remaining assertion is based upon international law. They claim the seizure and subsequent forfeiture violate the "Treaty Between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland on Mutual Legal Assistance in Criminal Matters" ("MLAT"). According to Claimants, under the MLAT, the United States was obligated to consult with the United Kingdom's Home Secretary before seizing the accounts. They also claim that the United States did not exhaust certain procedures as required by the treaty. We again disagree.

The United States and the United Kingdom entered into the MLAT which became effective on December 2, 1996. According to the treaty's Preamble, the parties entered into that treaty to "improve the effectiveness of the law enforcement authorities of both countries in the investigation, prosecution, and combating of crime through co-operation and mutual legal assistance in criminal matters." App. at 116. The treaty is primarily concerned

with drug trafficking, and related offenses, and seizure and forfeiture of proceeds and instrumentalities related to drug trafficking. Id. The parties to the treaty intended to allow the United States and the United Kingdom to "develop and share evidence . . . to facilitate criminal prosecutions abroad." United States v. Balsys, 524 U.S. 666, 715 (1998) (Breyer, J., dissenting). However, the treaty explicitly states that it is not intended to provide a private remedy. It states in pertinent part:

> [t]his Treaty is intended solely for mutual legal assistance between the Parties. The provisions of this

25

> Treaty shall not give rise to a right on the part of any private person to obtain, suppress, or exclude any evidence, or to impede the execution of a request.

App. at 116. (emphasis added). Therefore, even it if is assumed for argument's sake that the United States violated the MLAT, Claimants have no private right to enforce its terms.

Claimants' essential claim is that the district court had no jurisdiction to apply United States gambling law to a British citizen and British companies operating legal gambling businesses on English soil. To support that argument, they cite Zoelsch v. Arthur Anderson & Co., 824 F.2d 27 (D.C. Cir. 1987). However, to the extent it applies, we believe Zoelsch actually supports the district court's exercise of jurisdiction. There, in affirming the district court's dismissal for lack of subject matter jurisdiction, the court of appeals stated: "[J]urisdiction is appropriate when the fraudulent statements or misrepresentations originate in the United States, are made with scienter and in connection with the purchase and sale of securities, and 'directly cause' the harm to those who claim to be defrauded, even if reliance and damages occur elsewhere." Id. at 33. The court concluded that these jurisdictional prerequisites "are only a slight recasting, if at all, of the traditional view that jurisdiction will lie in American courts only over proscribed acts done in this country." Id.

Claimants argue that Zoelsch stands for the proposition that "federal securities law does not apply to conduct in the United States that was merely preparatory to an alleged securities violation which occurred overseas." Reply Br. at 18. They then attempt to draw parallels to the S 1955(d) forfeiture by arguing that IFS-NJ's activities in New Jersey were merely "preparatory" to legal gambling activities in England, and they conclude that the district court therefore lacked jurisdiction under Zoelsch.

However, Zoelsch affirms that American courts have jurisdiction "over proscribed acts done in this country[ ]" that have the required nexus to activities elsewhere. We therefore find no merit in Claimants' jurisdictional challenge to this in rem proceeding over New Jersey

property based upon conduct occurring in New Jersey. It may well be true that British citizens and British companies will be affected by this in rem action in New Jersey. This does not mean that the law of New Jersey or the law of the United States is being applied to those citizens or companies.

Claimants' international exhaustion argument arises from the fact that both the United States and England belong to the Organization of Economic Cooperation and Development ("OECD"). Claimants argue that the OECD requires "consultation and moderation by the U.S. in this context." Claimants' Br. at 39-40. However, Claimants never bother to explain how the government's institution of this forfeiture violated requirements of international law or, if a violation occurred, how it provides a defense from this forfeiture action.

In a related argument, Claimants insist that considerations of international comity preclude the instant forfeiture. That contention is again bottomed on the Claimants' belief that the forfeiture is an extraterritorial application of federal law against British citizens. We have already explained why there is no extraterritorial application of federal law to British citizens here.

Claimants also think it significant that S 1955 was originally aimed at organized crime, that Bowman's businesses are entirely legal in England, and that gambling no longer is regarded as the evil it once was in the United States. Indeed, argue Claimants, the fact that New Jersey itself has legalized casinos and lotteries plainly demonstrates that gambling is no longer associated with vice. Thus, the argument continues, comity required the district court to defer to Bowman's British licenses to conduct a gambling enterprise. However, the change in society's views towards gambling does not offer the district court a license to ignore a federal statute (or the state statute it incorporates) under the guise of international comity.

> Comity, . . . is the recognition which one nation allows
> within its territory to the legislative, executive, or
> judicial acts of another nation, having due regard both

> to international duty and convenience, and to the
> rights of its own citizens or of other persons who are
> under the protections of its laws.

* * *

> Comity cannot be the source of a disability that
> prevents a district court from having the power to

address wrongdoing that impacts a domestic court. . . .

Republic of the Philippines v. Westinghouse Elec. Corp., 43 F.3d 65, 75 (3d Cir. 1995) (emphasis in original)(citations and internal quotations omitted). Congress prohibited illegal gambling businesses as defined under state law, and authorized forfeiture of related property. We have already discussed how the relevant state law defines gambling broadly to include any conduct that materially aids any form of gambling activity. These legislative enactments reflect the "strong public policies" of the United States government, and the government is not required to tolerate activity that it defines as illegal merely because it affects someone who may live in a country where the activity is legal.

IV. CONCLUSION

For all of the above reasons, we will affirm the district court's grant of summary judgment to the government and its final order of forfeiture.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit

28