# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

March 13, 2012

No. 11-40387

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA

Plaintiff-Appellee

v.

WILSON ANTONIO ALTAMIRANO-ARGETA

Defendant-Appellant

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 7:10-CR-1358

Before GARZA, DENNIS, and HIGGINSON, Circuit Judges.

PER CURIAM:[*]

Appellant Wilson Antonio Altamirano-Argeta appeals the district court's assessment of a two-level sentencing enhancement for obstruction of justice. For the following reasons, we affirm.

## FACTS AND PROCEEDINGS

In September 2010, Altamirano-Argeta, a citizen of Honduras, was charged in a one-count indictment with being unlawfully present in the United

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 11-40387

States after having previously been deported, in violation of 8 U.S.C. § 1326 (a) and (b). Altamirano-Argeta elected to proceed to trial.

At trial, Altamirano-Argeta testified that he previously lived in the United States after entering in 1987. He lived in the United States until 2010, when he was deported to Honduras after serving time for a criminal conviction. Ten of his siblings and his mother currently live in the United States. His children also live in the United States.

According to Altamirano-Argeta's testimony at trial, he did not reenter the United States willingly. After being deported, he traveled from Honduras to Reynosa, a Mexican town close to Mexico's border with the United States, to work in Mexico as a welder. When he arrived in Reynosa, he testified that he was kidnapped as soon as he got off the bus, and he was taken to a two-story house with about 29 other people. The kidnappers took his wallet and threatened him in order to obtain his phone number and family information. He stayed at the house for almost three weeks and then was taken to a river with some of the other hostages on August 16, 2010. At the river, there were two men on the shore holding guns, telling him that he could not leave but that he would be set free on the other side of the river. Altamirano-Argeta explained, "[t]hey put us in one raft and they grabbed [drug bundles] in a different raft." The kidnappers then followed, carrying guns, behind the raft Altamirano-Argeta was in. Once the rafts crossed the river and arrived in the United States, the kidnappers took the hostages across a wall and, he testified, told them to run. However, Altamirano-Argeta did not run and instead waited to be picked up by Border Patrol so that he could be rescued. He attempted to inform the agents who apprehended him that he been kidnapped but was unsuccessful because the agents were occupied with apprehending other people in the area. Altamirano-Argeta was taken, along with several other people, to an immigration office, where he told an agent that he had been kidnapped, although it seemed to him

2

No. 11-40387

that the agent did not write that information down. However, Altamirano-Argeta admitted that he did not tell the agent about being kidnapped until after his statement had been taken and after he realized that he was going to be processed to go to court.

Three Border Patrol agents—Agents Zamora, Yanez, and Cortez—who were part of the group that apprehended individuals in the area and during the time that Altamirano-Argeta was apprehended, also testified. Each agent testified that: (1) he could not recall whether Altamirano-Argeta was in the group that he apprehended and took to the station, (2) he did not take information from people while they were being apprehended because it was not his job, and (3) no one in the groups apprehended seemed distressed or indicated that he or she had been kidnapped.

The agent who interviewed Altamirano-Argeta at the station, Agent Pena, testified that he read Altamirano-Argeta his Miranda warnings and then took a statement. Agent Pena explained that Altamirano-Argeta did not say that he had been kidnapped while giving a statement. While giving his statement, although he was asked about where, when, and how he had entered, or whether he had "anything else" to tell Agent Pena, Altamirano-Argeta did not say that he had been kidnapped. Altamirano-Argeta did not seem to Agent Pena to be injured or distressed during their interaction.

After taking Altamirano-Argeta's statement, Agent Pena gave the file he had created for Altamirano-Argeta to his supervisor and began cleaning Altamirano-Argeta to prepare him to appear in court. Agent Pena explained that while he was cleaning Altamirano-Argeta, Altamirano-Argeta said, "I got kidnapped in Mexico. You think I wanted to come?" Agent Pena did not report this conversation to his supervisor, who had Altamirano-Argeta's file, because he felt that Altamirano-Argeta had not behaved "like most of the people that get

3

kidnapped" because such people "tell you right away, as soon as they see you . . . . Or they keep talking about it."

Altamirano-Argeta's brother, Leslie Altamirano, testified that around August 7, 2010, he received the first of five phone calls. In that first call, the caller said that Altamirano-Argeta "was being detained and that [Leslie] had to get some money in order for them to release him." The caller initially demanded $10,000 but later dropped the demand to $5,000, which the Altamirano family agreed to pay. Leslie characterized the situation as being "like a kidnapping." Before the family could finish gathering the money, the phone calls stopped because Altamirano-Argeta had been detained by border patrol.

The district court instructed the jury that if it determined that all the elements of illegal reentry were met, it should then consider whether Altamirano-Argeta's "actions were justified by duress or coercion." The jury found Altamirano-Argeta to be guilty as charged.

The government objected to the Sentencing Guidelines calculation contained in the Pre-Sentence Investigation Report generated for Altamirano-Argeta on the ground that an enhancement for obstruction of justice should have been applied. The government argued that Altamirano-Argeta perjured himself in providing an untruthful story at trial to persuade the jury to acquit him. At sentencing, the district court found that Altamirano-Argeta's testimony on the issue of duress was false speaking; hence, the district court announced that it would apply the two-level obstruction of justice enhancement. With the two-level enhancement for obstruction of justice, Altamirano-Argeta's guidelines range was 78-97 months. The district court sentenced him to 78 months and three years of supervised release.

## STANDARD OF REVIEW

"In order to apply an enhancement [for obstruction of justice], the district court must find evidence supporting the enhancement to a preponderance of the

No. 11-40387

evidence." *United States v. Anderson*, 560 F.3d 275, 283 (5th Cir. 2009). This court "review[s] a district court's finding of obstruction of justice for clear error." *United States v. Holmes*, 406 F.3d 337, 363 (5th Cir. 2005) (quoting *United States v. Powers*, 168 F.3d 741, 752 (5th Cir.1999)) (internal quotation marks omitted). "A factual finding is not clearly erroneous as long as it is plausible in light of the record as a whole." *Id.* (internal quotation marks and citations omitted). "This is particularly true where a sentencing court's imposition of a § 3C1.1 enhancement is based, at least in part, upon an evaluation of a witness' credibility." *Id.* (quoting *Powers*, 168 F.3d at 752) (internal quotation marks omitted).

## ANALYSIS

In challenging the application of the obstruction-of-justice enhancement, Altamirano-Argeta contends that there is no evidence in the record that is contradictory to his testimony regarding duress and, therefore, the district court clearly erred in its perjury finding. Section 3C1.1 of the Sentencing Guidelines provides:

> If (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense, increase the offense level by **2** levels.

U.S.S.G. § 3C1.1 (emphasis in original).

In *United States v. Dunnigan*, 507 U.S. 87 (1993), the Supreme Court explained that:

> Of course, not every accused who testifies at trial and is convicted will incur an enhanced sentence under § 3C1.1 for committing perjury.  As we have just observed, an accused may give inaccurate testimony

No. 11-40387

> due to confusion, mistake, or faulty memory. In other instances, an accused may testify to matters such as lack of capacity, insanity, duress, or self-defense. Her testimony may be truthful, but the jury may nonetheless find the testimony insufficient to excuse criminal liability or prove lack of intent.

*Id.* at 95. Because of these possibilities, the Court laid out the following instructions for district courts:

> [I]f a defendant objects to a sentence enhancement resulting from her trial testimony, a district court must review the evidence and make independent findings necessary to establish a willful impediment to or obstruction of justice, or an attempt to do the same, under the perjury definition we have set out.

*Id.* The Court defined perjury as follows:

> In determining what constitutes perjury, we rely upon the definition that has gained general acceptance and common understanding under the federal criminal perjury statute, 18 U.S.C. § 1621. A witness testifying under oath or affirmation violates this statute if she gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory.

*Id.* at 94.

In this case, the record as a whole provides sufficient evidence to support the district court's finding that Altamirano-Argeta intentionally testified falsely. There is an inconsistency between the testimony of Altamirano-Argeta and the supposedly corroborative testimony of his brother. Altamirano testified that his kidnappers were drug smugglers who were using him and the other captives as decoys: they forced him to cross the river at the same time as their drugs, yet ordered him to run free, as promised, once the captives crossed to border fence into the United States. This story is in tension with the kidnapping-for-ransom story offered by his brother. His brother testified that leading up to Altamirano-

6

Argeta's apprehension by border patrol, he had been in kidnapping-like negotiations to secure Altamirano-Argeta's release from his captors. In the final conversation between Leslie and the kidnappers, it was agreed that Leslie would pay $5,000 for Altamirano-Argeta's release. It is unlikely that having held Altamirano-Argeta for three weeks and expended the effort to negotiate a promise to receive $5,000 from Leslie in return for Altamirano-Argeta's release, the kidnappers would immediately turn around and release Altamirano-Argeta unconditionally before receiving the ransom.

The district court's firsthand discrediting of Altamirano-Argeta's story is further supported by the lack of corroboration from Altamirano-Argeta's fellow captives. The agents who apprehended the group of approximately 27 aliens and the agent who transported them to the processing station all testified that none of the aliens, who were supposedly co-captives along with Altamirano-Argeta, looked distressed. They also testified that none of the aliens mentioned that they had been kidnapped, as testified to by Altamirano-Argeta.

Moreover, the district court's discrediting of Altamirano-Argeta's story has other indicia of support. Following his apprehension, Altamirano-Argeta was processed by Agent Pena at the immigration station during the course of which he was asked a series of questions, including when, where, and how he entered the United States. In response to the questions, Altamirano-Argeta did not mention that he had been kidnapped and forcibly brought into the United States. When asked as a final question whether "there was anything else that he would like to say at [that] time," Altamirano-Argeta made no mention of his kidnapping. Even after he was informed that "he could make any additions, deletions or changes to the form" and had an opportunity to review his answers, Altamirano-Argeta still failed to mention his kidnapping. By his own admission, it was not until after his statement had been taken and he realized that he was

No. 11-40387

going to be processed to go to court that Altamirano-Argeta decided to tell Agent Pena that he had been kidnapped.

In addition, Altamirano-Argeta had spent over twenty years living in the United States. Ten of his eleven siblings, his ex-wife, and his four children still live in the United States. After his deportation in March 2010, he spent only two months in Honduras before making his way, coincidentally, to the border city of Reynosa, Mexico, where he claimed he was kidnapped immediately upon arrival and forced to reenter the United States.

Against such factual backdrop, and having heard Altamirano-Argeta testify on direct examination, on cross examination, on redirect examination, on re-cross examination, and in response to the court's own clarifying questions, the district court was well-positioned to evaluate Altamirano-Argeta's credibility. As sentencing, the district court specifically stated, "[w]hat I'm relying upon is his testimony within the record and it being not credible. And he did not – he was not a credible witness. The Court being – having him in its presence while he testified did not come across as credible in the story that he told as well." The district court concluded that Altamirano-Argeta gave false testimony concerning a material matter with the willful intent to provide false testimony:

> You're not going to convince me that he did other – anything other than attempt to lie his way out of being found guilty in this case. I believe that the story he told was incredible, was fictional, was fanciful; was a creation of his desire to avoid the long prison sentence that he was facing because he had – he knew he had this drug-trafficking conviction on his record. . . . But I do know that it is the Court's belief and finding by a preponderance of the evidence that his testimony on the key issue of duress, the affirmative defense in this case, it was at the heart of the case, material to what the jury was going to do, was a lie and fictional. It is – doesn't comport with reality, doesn't comport with any experience the Court has – or case the Court has ever

8

No. 11-40387

had before it, both publicly and privately.  I'm not going to go outside the record though, in terms of support for my finding . . . but it belies common sense.[1]

Because the record as a whole supports the district court's finding that Altamirano-Argeta committed perjury, the court's imposition of a two-level enhancement for obstruction of justice was not clearly erroneous. *See United States v. Mudekunye*, 646 F.3d 281, 286-87 (5th Cir. 2011); *United States v. Flores*, 640 F.3d 638, 644 (5th Cir. 2011).  Altamirano-Argeta's sentence is AFFIRMED.

---

[1] The aforementioned adequate basis for the district court's finding supports the district court's valid assessment of credibility and in no way depends on speculation about jury deliberation time.  The district court's own reasoning demonstrates that it was validly assessing Altamirano-Argeta's testimony at trial, and was not in any way punishing him for his election to go to trial and to testify in his own defense.